[Crim. No. 9662. Third Dist. Jan. 25, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CLARENCE EDWARD VERNON et al., Defendants and Appellants.

854

856

**COUNSEL**

Stephen A. Smith, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Ramon M. de la Guardia, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**REGAN, J.**—Defendants Vernon and Comier, jointly charged with but separately tried by jury for the murder of Leroy McLaughlin, were each found guilty of the lesser included offense of voluntary manslaughter. (Pen. Code, § 192, subd. (1).) Their cases were consolidated on appeal.

In August 1977, defendant Vernon was living outdoors in the park, known as Memorial Park in Susanville, Lassen County. The victim was Leroy (Sarge) McLaughlin, who frequented the park, visited and drank wine with Vernon. On August 27, 1977, Vernon, McLaughlin, Erwin Buff, Denver Hoaglen and defendant Juan Comier were together in the park drinking wine.

After an exchange of some racial insults in which McLaughlin at one time stated he hated black people and Indians should be slaughtered, Hoaglen struck McLaughlin in the face with his fist several times. Thereafter, Buff hit McLaughlin in the jaw and defendant Vernon did likewise. Defendant Comier also hit McLaughlin with his fist.

When McLaughlin fell to the ground, and was lying on his back, all the men, including defendants Vernon and Comier, commenced variously kicking him in the head, shoulders, waist and hips. McLaughlin attempted to walk away but Hoaglen knocked him down again and asked for a knife. Defendant Vernon opened his pocket knife and gave it to Hoaglen who cut McLaughlin's throat.

McLaughlin's body was found the next day in the park. The body showed evidence of a severe beating and had a gaping hole in the throat. The medically determined causes of death were shock, hemorrhage and suffocation. In the medical examiners opinion, the blows to the head alone would have caused death.

When defendant Vernon was arrested in the park for public intoxication shortly after the body was found, he was interviewed about the death of McLaughlin. He was not a suspect at that time, but as the interview progressed at the jail, the interviewing officer, James Wages, began to suspect Vernon was involved. Consequently, the officer stopped questioning and advised Vernon of his constitutional (*Miranda*) rights. After about five minutes of nonproductive conversation following the *Miranda* warning, Vernon requested an attorney and the interview was terminated. The next day Vernon asked to see Officer Wages again and said he

wanted to talk. Wages reminded him that he did not have to talk since he had requested an attorney. However, Vernon indicated he did not want to see an attorney and wished to make a statement. The interview proceeded and was taped. The tape was admitted into evidence over objections.

Defendant Vernon's defense was principally his own testimony that the others had battered and killed McLaughlin and that he was there and had tried to stop it. However, he admitted he hit McLaughlin twice "[t]o shut him up."

Defendant Comier's trial produced essentially the same evidence by witnesses in the park which had been introduced in the trial of defendant Vernon. Comier was observed by a bystander to have kicked McLaughlin.

The defense at the Comier trial was principally testimony from Erwin Buff.[1] Buff testified that, although Comier was present, he did not kick McLaughlin. Buff stated that Comier had not done anything at all to help Hoaglen.

Vernon contends he was the victim of various instances of prosecutorial misconduct and that failure of trial counsel to object to these instances constituted ineffective representation and deprived him of a fair trial. We find otherwise from the record.

We do not perceive this as a closely balanced case in which there is grave doubt as to defendant Vernon's guilt, or where the alleged prosecutorial misconduct contributed materially to the verdict; nor is it one in which any alleged harmful results caused by the prosecutor could not have been obviated by a timely admonition to the jury. In such a case as this one, therefore, misconduct of a prosecutor generally cannot be raised on appeal in the absence of both an objection or assignment of such misconduct as error, and a request for an admonition to the jury to disregard it. (See *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 723 [135 Cal.Rptr. 392, 557 P.2d 976]; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Meneley* (1972) 29 Cal.App.3d 41, 58-59 [105 Cal.Rptr. 432].) There was no such objection or assignment of error; nor was there a request for an admonition.

[1]Vernon, Comier, Buff and Hoaglen were all arrested in connection with the case. The information accused all four, but Buff and Hoaglen entered pleas which disposed of their cases without trial.

We shall, however, discuss the alleged instances of misconduct of the prosecutor in relation to defendant Vernon's claim that his trial counsel was incompetent for failing to object or ask for admonitions. We have concluded there was no prejudicial prosecutorial misconduct of a nature calling for objection or request for admonition and hence no incompetence of defense counsel. Vernon contends there was prejudicial misconduct by the prosecutor in using leading questions. He points to the inquiry of the officer who discovered the body, whether the victim appeared to have been beaten, and the question asked of another witness if the knife found in the area was a "buck-type" knife. Vernon also claims the prosecutor inflamed the jury by "dwelling on" the appearance of the cut on the victim's throat and whether it was one or several cuts. Likewise, Vernon dwells on the prosecutor's frequent use of the word "blood" and his questioning of one witness as to the amount of blood she saw.

The above contentions as to misconduct are specious. It was necessary for the prosecution to prove the cause of death to have been a beating or a throat cutting, or both. His questions were not leading to any extent suggesting misconduct. As to the knife, the questions were necessary since a large buck knife belonging to Buff was found in the area but the physical and testimonial evidence showed a smaller pocket knife, one belonging to Vernon, had been used to cut McLaughlin's throat. The prosecutor was simply trying to straighten out any possible confusion resulting from two types of knives being referred to by the witnesses. The questions were not inflammatory. The references to blood were necessary in connection with the prosecutor's line of questioning to establish the severity of the injuries inflicted upon the victim, and their type.

As to defense counsel's failure to object to the above lines of questioning by the prosecutor, we need only note that defendant Vernon has in no way shown us that trial counsel was inadequate or ineffective. The burden to do so is upon the defendant. (*People* v. *Stanworth* (1974) 11 Cal.3d 588, 613 [114 Cal.Rptr. 250, 522 P.2d 1058].) The record does not show that counsel was ignorant of the facts or the law in this case or that a vital defense was withdrawn, reducing the trial to a farce or sham. (See, e.g., *People* v. *Jenkins* (1975) 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857].) Ability of trial counsel seems all the more apparent when it is recalled that defendant entered trial charged with first degree murder and emerged with a conviction of voluntary manslaughter.

■ Vernon contends it was reversible error to allow one Ralph Dresel, a deputy sheriff and a bailiff, to testify. The contention has no merit. Vernon claimed at trial that Dresel was "prejudicially tainted" and objected to his testimony. Objection was overruled, and the witness was allowed to authenticate a note written by Vernon in jail which incriminated himself. The basis of objection was that Dresel had been in the courtroom after a motion to exclude witnesses. Whatever validity the objection might have had, if any, under ordinary circumstances, it had no validity here since Dresel's presence in the courtroom was necessary due to his official position as bailiff. The trial court was informed by the prosecution that it had not been the intention of the prosecution to use Dresel as a witness at the beginning when the exclusion order was made. The trial court on learning, in addition to this factor, the purpose of Dresel's testimony was merely to prove a handwriting exemplar, properly overruled the defense objection. Discretion on such testimony is allowed and no abuse is apparent here. (See Evid. Code, § 777; *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 894 [83 Cal.Rptr. 260], which was disapproved on other grounds in *People* v. *Gainer* (1977) 19 Cal.3d 835, 846 [139 Cal.Rptr. 861, 566 P.2d 997].)

■ Vernon contends it was error to fail to give his requested jury instruction involving principals, which read: "The mere fact that a number of persons are principals in an offense of assault, battery or disturbance of the peace, does not show that all would be principals in an offense of murder or felonious assault that may occur during such a disturbance." Vernon gives no reason why such an instruction was required by law in this case, and we are aware of none. The jury was instructed that mere presence at the scene and the failure to take steps to prevent a crime does not establish one as a principal by aiding and abetting. This instruction was proper while the one refused was not. The refused instruction was based on *People* v. *Zammora* (1944) 66 Cal.App.2d 166 [152 P.2d 180], which involved the participants in a fight between rival street gangs, involving about 22 persons. The instruction given by the trial court in the case before us accurately reflected the situation of this case, while the refused instruction based on the facts of the *Zammora* case would not have done so. An instruction not justified by the facts should not be given. (*People* v. *Bynum* (1971) 4 Cal.3d 589, 604 [94 Cal.Rptr. 241, 483 P.2d 1193].)

■ Vernon contends the trial court's overruling of his objections to admitting the tape of his second interview with Officer Wages was reversible error. Defendant complains of the "sloppy and dilatory

admonition" as to his *Miranda* rights and the fact that counsel was not "quickly appointed." Adverting to the facts, we note the first tape-recorded interview with Officer Wages was without a *Miranda* warning, since Vernon had been picked up on a drunkeness charge and was not then a "suspect." The trial court subsequently ruled the first taped interview inadmissible. It will be recalled the second interview with Officer Wages was under entirely different circumstances. Where, as here, the interviewee becomes a suspect, is given his *Miranda* warning, and has signified he wants an attorney, all interrogations must cease. (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 237 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735-736 [125 Cal.Rptr. 798, 542 P.2d 1390].) This was what occurred at the first interview. On the other hand where the interviewee (as here) *thereafter volunteers* to initiate a new statement, it may be taken, inquiries may be conducted and a recording is admissible as against a *Miranda* objection. (See *People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620].) We see no evidence in the record to derogate from the trial court's implied determination that the second statement was voluntary. (Cf. *People* v. *Jiminez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].)

Vernon objects to the form of questioning by Officer Wages, calling it "leading" and "fundamentally unfair." He also claims the evidence (tape) was not the best evidence since the officer (Wages) was available as a witness and the probative value of the tape was outweighed by its prejudice to him under Evidence Code section 352. Defendant cites no pertinent authority for these objections to the tape and we find none. The objections are meritless.

Having listened to the tape in question, we find it to constitute certain admissions against interest but it was *not* a confession. Assuming arguendo that it was played to the jury in error, it was not reversible error, and we conclude beyond a reasonable doubt (in the face of other overwhelming evidence of guilt) that the error did not contribute to the verdict. (*People* v. *McClary, supra,* 20 Cal.3d at p. 230; *Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824].)

Defendant Comier contends the denial of his motion for acquittal was reversible error.

Comier moved for acquittal under Penal Code section 1118.1 at the close of the People's case, on the ground the evidence was insufficient to sustain a conviction for murder or any lesser included offense. The trial court granted the motion as to first degree murder, but let the jury consider lesser included offenses. The ultimate verdict, as indicated above, was guilty of voluntary manslaughter.

■ As an appellate court we must apply the substantial evidence rule, which is the same test the trial court is required to apply to the motion. (*People* v. *Wong* (1973) 35 Cal.App.3d 812, 828 [111 Cal.Rptr. 314].) Accordingly, the trial court's whole or partial denial of the motion may not be set aside "unless it clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below." (*Ibid.*)

■ Voluntary manslaughter is the killing of a human being by a defendant upon a sudden quarrel or in the heat of passion, or by a defendant who lacked malice because of diminished capacity. (Pen. Code, § 192; *People* v. *Waters* (1968) 266 Cal.App.2d 116, 122 [71 Cal.Rptr. 863]; *People* v. *Moles* (1970) 10 Cal.App.3d 611, 615 [89 Cal.Rptr. 226].)

■ The evidence shows Comier participated in the beating of McLaughlin. There was testimony by a witness that Comier, together with the others aforementioned, kicked McLaughlin while he was on the ground. As the men, including Comier, kicked at the victim's prostrate body, the witness heard thuds as the kicks landed and heard McLaughlin moan. Another witness also saw Comier, together with Vernon, Buff and Hoaglen, kicking the victim.

■ When the conduct of two or more persons contributes concurrently as proximate causes of death, the conduct of each person is a proximate cause regardless of the extent to which each contributes to the death. (See 1 Witkin, Cal. Crimes (1963) Elements of Crime, §§ 78-80, pp. 79-80; Pen. Code, § 31. CALJIC No. 8.55.)

■ We find there was substantial evidence to support the ruling of the trial court on the motion to acquit.

Comier contends there were various defects or irregularities in the trial proceedings which deprived him of a fair trial. We disagree.

At jury voir dire, a prospective juror informed the court that Comier had been tried for raping her niece. This information came out in open court in response to a question of the jury panel by the court, in which the court asked: "Have any of you or anyone close to you ever either been the victim of or been charged with a charge similar to the one in this case?" The court immediately on its own motion excused the juror and went on with jury selection. Neither counsel raised any objection to the procedure; no admonishment of the prospective juror being questioned was asked for; nor was any motion made for a mistrial. ██ Now, on appeal, Comier contends the failure to admonish the jury to disregard the excused juror's implicatory remark or to declare a mistrial was reversible error. We hold that no *sua sponte* admonishment was required. We do not perceive that this early in the trial an admonishment would have accomplished anything of aid to defendant. It would have had a more deleterious than beneficial effect by emphasizing the remark. The failure of defense counsel, who the record shows to be competent, to request an admonishment confirms our view. It was a wise tactical decision on counsel's part. ██ Insofar as a mistrial is concerned, it is within the sound discretion of the trial court. It should not be declared where the court is satisfied no injustice has resulted or will result. (See *People* v. *Ward* (1968) 266 Cal.App.2d 241, 249 [72 Cal.Rptr. 46]; *People* v. *Ray* (1967) 252 Cal.App.2d 932, 962-963 [61 Cal.Rptr. 1].) ██ Nor will a new trial be granted for remarks overheard by jurors where neither party to the case was at fault, unless it can be said the remarks probably influenced the verdict. (See *People* v. *Kross* (1952) 112 Cal.App.2d 602, 611 [247 P.2d 44]; *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442].) ██ In light of the evidence against Comier in this case, we deem it unlikely the remarks influenced the verdict.

██ Comier contends certain redirect examination of a principal prosecution percipient witness was prejudicial and cause for reversal in spite of the court's admonition to the jury to disregard a portion of it. Comier's theory is that the prosecution deliberately maneuvered the witness into a statement that he had been in trouble with the police before. This theory is not supported by the record; nor is Comier's assertion that his trial counsel by more timely objections could have prevented the information from coming out. What occurred is that the witness explained on direct examination by the prosecutor that although she witnessed the assault on Saturday afternoon she did not notify the police until late Sunday since she did not realize until then that she had witnessed a killing. Over defense hearsay objections, she testified also that a friend, who had been in the park with her when the attack was

witnessed, had told her he didn't think it would do any good to call the police. On cross-examination by defense counsel, she was asked whether her friend had said that Lassen County had a reputation for assaults and violence and that the police wouldn't do anything about an assault in the park. She answered in the negative. Finally, on redirect, the prosecution asked her to explain the negative answer to the above questions. Over defense hearsay objections, she was allowed to testify since the court said the whole picture should be brought out. She then blurted out that when she mentioned calling the police to her friend, he said it wouldn't do any good since Comier "had been in trouble before." The trial court immediately struck the answer and admonished the jury to disregard it. It is this sequence which Comier now describes as prejudicial and a deprivation of a fair trial; he also asserts it was misconduct for the prosecutor to ask the witness to explain her earlier answer, which resulted in the quoted statement above.

We hold the above-described sequence of interrogation of the witness was not prejudicial; it did not deprive Comier of a fair trial; and it did not demonstrate any misconduct of the prosecutor. The prosecutor's questioning was obviously not misconduct but merely normal redirect in response to cross-examination which left a gap. It showed no bad faith, deception or reprehensible methods. (See *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 154 [107 Cal.Rptr. 34, 507 P.2d 642]; *People* v. *Gomez* (1976) 63 Cal.App.3d 328, 338 [133 Cal.Rptr. 731].) The court struck the answer from the record and admonished the jury to disregard it. The court also gave CALJIC No. 1.02 relating to disregarding stricken evidence. These two actions blunted any effect the answer might have had and "removed any significant impact the [stricken] question might otherwise have had on the jury." (*People* v. *Vallerga* (1977) 67 Cal.App.3d 847, 885 [136 Cal.Rptr. 429].)

Finally, were we to hold any error to have occurred in regard to the portion of the testimony referred to above, we would be constrained to declare it harmless in light of the overwhelming eyewitness evidence of guilt. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

We need note only in passing that Comier contends it was "flagrant and blatant impropriety" for the prosecutor to attempt to impeach the witness on cross-examination when she was a defense witness during the defense phase of the trial. This occurred after she had testified as to the color of Comier's pants and the prosecutor showed she could not actually remember. Comier's argument on appeal is that the prosecutor should

not have been allowed to do this in light of the fact the prosecutor originally used her as a principal witness and relied upon her eyewitness account. No objection was made at trial to the prosecutor's cross-examination in this regard. The contention is entirely specious. (See Evid. Code, § 785.)

 Comier contends he did not receive competent trial representation. We find from the record that trial counsel was competent. Some of Comier's arguments in this regard have heretofore been mentioned. He has used a shotgun approach to his contentions of inadequacy of representation and we find little need be said of each after stating the basic rule. It is a defendant's burden to establish trial counsel's ineffectiveness and he must do so as a demonstrable reality, not speculation. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) He must show counsel was ignorant of the facts or law to the extent that a crucial defense has been withdrawn and the trial reduced to a farce or sham. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

 Comier contends his counsel showed incompetence (a) by failure to object to opinion testimony on the length of time the victim had been dead; (b) by failure to object to the witness' explanation of her former testimony for rehabilitation purposes on cross-examination; and (c) by failure to move for a mistrial after the statement by a prospective juror.

Police Officer Jack Burk testified that based on his experience as a police officer it was his opinion the body had been in the park at least 24 hours when they found it. It is true there was no foundation qualifying Burk as an expert medical witness, and defense counsel did not object. It is also true, however, that later bona fide expert-witness evidence was put on by the People in the form of testimony by a medical doctor, who testified that after 36 hours it was impossible, upon examination of the body, to tell the exact hour of death. However, the medical expert did say the time of death could be consistent with death on August 27, 1977, as late as midnight. The exact time of death was not a crucial element in this case, in view of the eyewitness testimony of the brutal attack. There was no compelling reason for defense counsel to object to the question, asked by the prosecutor of Officer Burk, as to how long he believed the body had been there. He had stated he had seen a number of bodies exposed to the elements and based his testimony on that experience. He did not claim to be nor was it attempted to show he was a *medical* expert on the

causes of death or the time of death. Moreover, he testified as to how long he believed the body had been in the park, not how long it had been dead, mentioning such things as numbers of insects about the body. A lay witness can give an opinion as to something rationally based on his perception. (Evid. Code, § 800.) The testimony being proper, there was no incompetence in failure of counsel to object to it.

Comier's complaint as to his trial counsel's handling of the cross-examination of a witness is that he allowed her "to rehabilitate her evasive and inconsistent prior statements to the police and at the preliminary hearings." Comier says her "explanations" were nonresponsive to defense counsel's cross-examination and he should not have permitted them since they rehabilitated a key prosecution witness. The testimony referred to relates to the number of times she observed Comier kick McLaughlin when he was on the ground. She seemed uncertain as to the exact number. She was also uncertain as to exactly which part of McLaughlin's body Comier was kicking when she observed the various attackers all kicking him at once. This type of confusion is quite understandable and her recollection as to exact number of kicks and exact areas of McLaughlin's body being kicked in the melee by the various attackers was understandably not precise as to exact details. From our reading of the record, it cannot quite accurately be said that the witness "rehabilitated" herself since she had been confused, not evasive, and the exact number of kicks administered by Comier and the exact place on the body he administered them as a principal in concert with the other attackers, where the attack resulted in death, is not of significant importance. No incompetence of trial counsel appears here.

We have previously discussed the failure of trial counsel to move for a mistrial under the circumstances of a prospective juror's remarks concerning Comier's involvement with a charge of rape of her niece. There was no incompetence in failure to so move in light of the immediate action of the trial judge. As we said previously, it was well within the realm of trial tactics of a good defense counsel to allow the brief moment to pass by quickly rather than make an issue of the matter and thus plant the remark firmly in the prospective jurors' minds as of great importance. In any event, were we to say this was incompetence, we could hardly hold it reasonably probable the verdict would have been otherwise had the jury not heard the prospective juror's remark, in view of the overwhelming evidence developed at trial against Comier. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

■ Comier contends it was error to admit his bloodstained pants into evidence. We hold it was not error. The blue jeans he was wearing at the time of his arrest had stains on the right leg. At trial, over defense objections, the pants were admitted into evidence with expert testimony the blood stains were type B human blood and the victim was the only person involved in the fracas who had type B blood. It is Comier's argument that since he was arrested two days after the crime, the "mere fact" that the blood was analyzed to be human blood, type B, does not "absolutely confirm" that it came from the victim. We agree completely that it does not absolutely confirm that the blood came from the victim. However, to be admissible, evidence need not absolutely confirm anything. It is axiomatic that its weight is for the jury. That the evidence was admissible is without doubt.

■ Comier contends the trial court committed reversible error in its instructions to the jury on aiding and abetting. His argument is that the use by the trial court of CALJIC No. 3.01 (1974 rev.), which is the latest approved instruction on the definition of an aider and abettor was error since, in defendant's view, the instruction is erroneous under the case law. In brief, his argument is that "shared criminal intent" is an essential element of all aiders and abettors. This is simply not the law and is shown not to be by some of the various cases cited by defendant Comier himself. Thus, in *People* v. *Vasquez* (1972) 29 Cal.App.3d 81, 87 [105 Cal.Rptr. 181], the court made it plain that an aider/abettor *may* have the same "evil [criminal] intent" as the perpetrator, *or* he may aid and assist with simple knowledge or awareness of the wrongful purpose of the perpetrator. Of course it is true, as claimed by defendant, that mere presence at the scene of the crime is not sufficient to make an accused a participant or aider/abettor. (See *People* v. *Francis* (1969) 71 Cal.2d 66, 72 [75 Cal.Rptr. 199, 450 P.2d 591]; *People* v. *Durham* (1969) 70 Cal.2d 171, 180 [74 Cal.Rptr. 262, 449 P.2d 198].) That is not the situation in this case, however, and the jury was so instructed. We hold that the giving of CALJIC No. 3.01 (1974 rev.) was entirely proper in this case.

■ It is contended on behalf of both defendants Vernon and Comier the evidence is insufficient to support their convictions of voluntary manslaughter. These arguments consist of a mixture of assertions the evidence did not prove guilt beyond a reasonable doubt and efforts to cause us to reweigh the evidence.

■ The law is clear that the test on appeal is *not* whether the evidence proves guilt beyond a reasonable doubt, but rather whether

there is any substantial evidence of guilt. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 487 [116 Cal.Rptr. 217, 526 P.2d .225].) In reviewing for substantial evidence, we do not reweigh it, but we look at it in the light most favorable to the People. (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

 We have previously described the most essential evidence in the prosecution's case. It is unnecessary to repeat it here. The basic elements of defense have also been described, and need not be reviewed. Looking at this record in the light most favorable to the People, as we must on appeal, we have no hesitation in stating our compelling conclusion that there is substantial evidence to support the verdicts of guilty of voluntary manslaughter as to each defendant.

The judgments are affirmed.

Puglia, P. J., and Reynoso, J., concurred.