[No. F006892. Fifth Dist. Jan. 8, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL GLENN PIKE, Defendant and Appellant.

734

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Joan W. Cavanagh, Assistant State Public Defender, and Julia C. Newcomb, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Roger E. Venturi and James T. McNally, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BEST, J.—Defendant was convicted by jury of vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)), a felony, and additional Vehicle Code violations. On this appeal he challenges only the vehicular manslaughter conviction for which he was sentenced to prison for the middle term of four years. We affirm the judgment.

### STATEMENT OF FACTS

Because defendant challenges the sufficiency of the evidence regarding the proximate cause of Officer Esquibel's death, it is necessary to provide a detailed and lengthy statement of facts.

On August 8, 1985, at approximately 3:20 in the afternoon, California Highway Patrol Officer Gregory DeLaCruz was in his marked patrol car, a Dodge Diplomat, stopped at the intersection of 10th Avenue and Hanford-Armona Road. He was northbound on 10th Avenue when he noticed a motorcyclist, defendant Russell Glenn Pike, headed eastbound on Hanford-Armona Road. As defendant turned left and northbound onto 10th, DeLaCruz noticed that the cycle did not have a left side mirror. DeLaCruz followed on 10th and determined to pull defendant over. He planned to cite him for the equipment violation, a fix-it type of infraction. He was about 150 feet behind defendant when he activated the red spotlight on his car and accelerated in an attempt to catch up with the cycle. As the two were approaching the fairgrounds, defendant accelerated and DeLaCruz did the same. DeLaCruz paced the cycle at 66 miles an hour, although the speed limit was 45 miles per hour. As they approached the 10th Avenue overpass over Highway 198 near Third Street, defendant began slowing down where the speed limit changed from 45 to 35 miles per hour. DeLaCruz saw defendant turn his head over his left shoulder and look in DeLaCruz's direction. About one to one and one-half miles from the intersection of 10th and Hanford-Armona, DeLaCruz also activated his siren for a couple of short bursts. DeLaCruz thought defendant would pull into the market at the corner of 10th and Lacey and stop; instead, defendant took the curve onto East Lacey. Defendant turned and looked in DeLaCruz's direction a couple of times. After making the curve, defendant accelerated. As they continued accelerating while proceeding eastbound on Lacey, DeLaCruz, in

addition to his red lights, again activated the siren on full. At that point, DeLaCruz planned to cite defendant for the speeding as well as the equipment violation. Near the Golden Pancake House, DeLaCruz called on his radio to report he was chasing a motorcycle. He was still about 150 feet behind the motorcycle. Shortly thereafter, as DeLaCruz neared 9¼ Avenue, California Highway Patrol Officer Esquibel, who was stopped facing westbound on Lacey, came on the radio and asked DeLaCruz if he was headed toward Highway 43. At some point, DeLaCruz called in the license number of the cycle and he thought it must have come back without any warrants.

Defendant and DeLaCruz proceeded eastbound on Lacey. Up to that point, defendant had looked back at the officer some three or four times. At the turn from Lacey to Highway 43, defendant slowed down and moved to the inside of the curve. DeLaCruz went wide around him. As he caught up with defendant, DeLaCruz used his public address system and told him to pull over or he would ". . . knock him off." This was a proper tactic to try to get defendant to stop even though the officer did not intend to do that. Defendant "kind of smiled" and kept going. During the turn both vehicles slowed down and defendant "kind of drifted out into the right front door of [the] patrol vehicle" and bumped it. The officer slowed even more so as not to flip defendant. Defendant looked down, kicked the patrol car door, turned around, laughed at DeLaCruz and took off accelerating. Immediately thereafter, DeLaCruz called Fresno dispatch and notified dispatch they had touched. Later, DeLaCruz found a small dent, a little gouge and a footprint on the patrol car door.

Defendant proceeded southbound on Highway 43 toward the cloverleaf to Highway 198. At the cloverleaf, DeLaCruz was about 50 feet behind him, tires squealing, as defendant sped eastbound on Highway 198. That section of Highway 198 is a four-lane road, two lanes in each direction, with a center divider. Defendant proceeded into the fast lane of eastbound Highway 198, but shortly started zig-zagging between the two eastbound lanes so that DeLaCruz could not pass him. As DeLaCruz proceeded on 198 he saw Esquibel's Ford LTD patrol car going from Lacey to Highway 43. Driving in the center of the road, DeLaCruz followed defendant at about 50 feet with both his red light and siren on. Shortly, DeLaCruz saw Esquibel's car on the cloverleaf entering eastbound 198 with his headlights flashing on and off. DeLaCruz saw Esquibel's car go across the center divider of Highway 198 and into the fast lane of westbound Highway 198 as he anticipated defendant making a U-turn. DeLaCruz heard Esquibel's car skid and almost stop. DeLaCruz noticed that traffic in the westbound lane of 198 had started to pull over. At that point, both defendant and DeLaCruz were almost at a stop on their side of the road. DeLaCruz was right at defend-

ant's left rear and saw him look toward the left. Defendant leaned forward, accelerated again, and DeLaCruz followed suit. The road narrowed to two lanes, and defendant was in the eastbound lane, accelerating and pulling away from Officer DeLaCruz. At this point, there was other eastbound traffic and defendant began going around them at the intersection of Highway 198 and Seventh Avenue. There was, however, also traffic going westbound which began to pull over as defendant passed the eastbound traffic. DeLaCruz spoke to Esquibel who had asked if Esquibel should go around defendant. DeLaCruz stated he should not. DeLaCruz again spoke to Esquibel and they agreed to just stay behind defendant. Passing eastbound traffic, some of which pulled over to the shoulder, DeLaCruz and Esquibel pursued defendant. Defendant began pulling away from DeLaCruz again until they were about 150 yards apart at the point they passed Seventh Avenue. Defendant did not look behind again.

After the cycle passed Sixth Avenue, DeLaCruz noticed some traffic in the eastbound lane. The cycle passed that traffic. As DeLaCruz came up to that traffic, it yielded to the right so he could pass in the traffic lane. At this time, DeLaCruz was able to call in a description of defendant. He was not wearing a shirt and DeLaCruz saw tattoos on the back of his shoulder. Between the two bridges after Sixth Avenue, DeLaCruz noticed defendant catch up to a tan car that appeared to be about to pass traffic in front of it. As defendant began to pass the tan car, the tan car pulled out, realized defendant was there and pulled back to the right and toward the shoulder of the road. The car fishtailed a bit as the driver attempted to maintain control. DeLaCruz notified dispatch that defendant nearly had caused an accident. DeLaCruz passed the tan car which had yielded so the officer could pass in the traffic lane. DeLaCruz then began drifting toward the center of the road looking for westbound traffic. He noticed a white semi-truck about one-half mile down the road along with other traffic behind it. At the Cross Creek Bridge, DeLaCruz moved over into the westbound lane so that traffic could see he was coming and would yield. He could see defendant as defendant passed the eastbound vehicles. Officer DeLaCruz had his lights activated. He saw Officer Esquibel's car, light activated, following behind. DeLaCruz started to catch up to three or four eastbound cars. The last car pulled over to the right and DeLaCruz started to pass. After passing that car, DeLaCruz approached the next car, a tan pickup. The pickup had gone to the right and then started to drift back into the eastbound lane from the right side. When DeLaCruz realized the pickup was continuing into the lane, he hit his brakes and started going around the pickup, aware at the time that the semi-truck was approaching in the westbound lane. DeLaCruz went into the westbound lane as the oncoming semi-truck was there, half way off the westbound roadway. DeLaCruz was skidding, headed for the trailer of the semi-truck. Rather than hit the truck, he took his foot off the

brakes and steered back toward the right, the eastbound lane. He began to skid off the shoulder of the eastbound lane and then over to the westbound lane.

As he was skidding, DeLaCruz's car hit the front end of Esquibel's car, which was now alongside DeLaCruz, and both cars spun. Esquibel's car continued off the road, hitting a road grader parked on the north shoulder of the westbound side of the road. DeLaCruz's car came to rest off the westbound side of the road about 15 feet from Esquibel's car. DeLaCruz's knee was "banged up . . . a little bit."

DeLaCruz got out of his car and saw a fire under the engine compartment of Esquibel's car. He noticed defendant continuing eastbound and accelerating. DeLaCruz called Fresno dispatch to tell them of the accident and to send an ambulance. Thereupon he got the fire extinguisher from his car. DeLaCruz and others were able to force the car door open and drag Esquibel forcibly from the car wreckage that had enveloped him. Esquibel was alive. He was wearing a bullet-proof vest.

The jury viewed a videotape of the scene of the accident taken on the day of the accident. Various witnesses who had witnessed the chase were called. In all material respects, the witnesses corroborated DeLaCruz's account of the incident.

Defendant was described by one witness as "swinging in and out, really driving crazy." A number of witnesses also estimated defendant's speed at between 70 and over 100 miles per hour. One witness described defendant's reaction to the accident behind him as follows: "He was looking over his right shoulder . . . watching what was going on back there." Defendant then "raised up his fist and smiled. Like he did something great or something." Defendant then continued toward Visalia.

After defendant was arrested, Officer Kanna conducted a tape-recorded interview with him which was played to the jury. In his statement, defendant admitted that he decided to try to outrun the officer rather than stop. Defendant had seen the officer turn to follow him, and defendant had seen the officer's red light. He tried to get away because he had outstanding tickets.

Various members of the Multi-disciplinary Accident Investigation Team, MAIT, testified to their investigation of the accident scene. Raymond Carlson examined the two California Highway Patrol cars driven by DeLaCruz and Esquibel. He found no mechanical problems that would have contributed to the accident.

Edward Wells was part of the MAIT assigned to gather evidence. He arrived at the scene around 4:45 p.m. and measured a variety of skid marks related to the cars. He also determined the coefficient of friction at various locations on the roadway. Esmay, who examined the evidence, determined that the Dodge driven by DeLaCruz was going approximately 88 to 98 miles per hour at the time it first braked. It slid for 431 feet before it collided with the Ford driven by Esquibel. At the time of the collision, the Dodge was going approximately 33 miles per hour. The Ford at that point of impact was going approximately 50 to 60 miles per hour. The Ford then slid across the dirt and pavement, slowing as it did so. When the Ford hit the road grader its speed was approximately 46 miles per hour. Esmay indicated that there were no visible brake marks from the Ford, but the Ford quite probably was braking heavily.

Warren Studer, the head of the MAIT investigating the accident, testified as to his conclusions regarding the incident. He was of the opinion that the motorcyclist the officers were pursuing was a noncontact involving party because of his violation of failing to yield to an emergency vehicle, or failing to stop when requested, and that this motorcyclist was driving in a willful and wanton manner that violated reckless driving statutes. On cross-examination when asked to consider just the collision between the two vehicles, he concluded that the primary cause of the accident was improper driving by Esquibel. He should have positioned his car at a safe distance behind DeLaCruz's car, rather than what may have been an attempt to pass DeLaCruz's skidding car. However, the motorist, who caused Officer DeLaCruz to attempt evasive action, was drifting back into the lane as a reaction to the motorcycle passing him at high speed. Officer Studer considered the tactic of a high speed pursuit of the motorcycle to be appropriate.

DeLaCruz originally had hurt his left knee and he had suffered some small cuts on his hand in the process of removing Esquibel from the car. DeLaCruz went to the hospital where he was examined by Dr. Robert Ricketts. Dr. Ricketts found minor superficial abrasions on the outside of the left knee.

Esquibel died on August 21, 1985, as a result of injuries sustained in the accident.

## THE DEFENSE

Defendant did not testify. He called one witness, George Blair, an expert in accident reconstruction. Mr. Blair reviewed the MAIT report and the automobiles and concluded that the Ford was going between 67 and 96 miles per hour at the time it collided with the road grader. He concluded

that the Ford was going 70 to 96 miles per hour at the time of impact with the Dodge. The parties stipulated that defendant's driver's license had been suspended prior to August 8 and that he was aware of the suspension.

DISCUSSION

I

*Did the trial court commit prejudicial error in failing to instruct that a finding of gross negligence could not be based solely on facts inherent in the crime of vehicular manslaughter?*

■ Citing this court's opinion in *People* v. *McNiece* (1986) 181 Cal.App.3d 1048 [226 Cal.Rptr. 733], defendant contends that the trial court erred in failing to instruct the jury that a finding of gross negligence requires more than a finding that defendant committed the unlawful act which served as the basis for vehicular manslaughter. Defendant misconstrues our holding in *McNiece,* which was that *under the circumstances of that case* the failure of the trial court to clarify its instructions defining gross negligence constituted reversible error. The circumstances requiring clarification of the instructions on gross negligence were (1) defendant was prosecuted for felony vehicular manslaughter under Penal Code section 192, subdivision (c)(3), of which the driving of a vehicle while under the influence of alcohol is an essential element; (2) the unlawful act relied upon was running a stop sign; and (3) the prosecutor's closing argument could have misled the jury to believe that the defendant's driving under the influence of alcohol could, in and of itself, constitute gross negligence.

With these circumstances in mind, we held in *McNiece*: "Under the circumstances, the definition of *gross* negligence was improperly presented to the jury. It was not made clear what the jury was required to find.

"Again, while the instructions indicated there was a difference between the two levels of negligence, nowhere in the instructions was the jury actually told that drunk driving alone did not constitute gross negligence. It was indicated the two kinds of negligence differed, and gross negligence was defined generally; however, no instruction clarified that something in addition to appellant's being under the influence of alcohol was necessary to establish gross negligence. There was no request for this additional instruction. It was necessary in all fairness that the jury be instructed that the element of gross negligence could not be supported solely by facts which satisfied other essential elements of section 192, subdivision (c)(3), namely (1) drunk driving and (2) a traffic offense." (*People* v. *McNiece, supra,* 181 Cal.App.3d at p. 1057.)

In the instant case, defendant was prosecuted and convicted of felony vehicular manslaughter under Penal Code section 192, subdivision (c)(1), in that he "did unlawfully kill, without malice, Dean Esquibel while driving a vehicle and in the commission of an unlawful act, not amounting to a felony, with gross negligence." The court instructed the jury as follows: "The crime of vehicular manslaughter is the unintentional but unlawful killing of a human being in the driving of a vehicle.

"Killing is unlawful when a person commits an act inherently dangerous to human life or safety, amounting to a misdemeanor or an infraction—as will be later defined—or negligently commits an act ordinarily lawful which might produce death.

"In order to prove the commission of the crime of vehicular manslaughter, each of the following elements must be proved:

"One, that a human being was killed.

"Two, that the driver of the vehicle committed an unlawful act, to wit, a violation of speeding or reckless driving or negligently committed an act ordinarily lawful which might cause death.

"And, three, that such unlawful act or negligent conduct was a proximate cause of the death of the person killed.

"Proximate cause of a death is a cause which, in natural and continuous sequence produces the death, and without which the death could not have occurred or would not have occurred.

"If you find that the defendant is guilty of manslaughter, you must also find whether the act causing the death was done with or without gross negligence, and you must declare your finding in that respect in your verdict.

"If you find that the defendant was guilty of manslaughter in the driving of a vehicle, but entertain a reasonable doubt as to whether the act causing death was committed with gross negligence, it would be then your duty to find that it was committed without gross negligence.

"Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do under similar circumstances. It is the failure to use ordinary or reasonable care. Ordinary or reasonable care is that care which

persons of ordinary prudence would use in order to avoid injury to themselves or others under similar circumstances.

"The term 'gross negligence' as used in the definition of manslaughter given in these instructions means the failure to exercise any care or the exercise of so little care that you are justified in believing that the person whose conduct was involved was wholly indifferent to the consequences of his conduct to the welfare of others."

At all relevant times, Penal Code section 192, subdivision (c), defined four types of vehicular manslaughter. The element common to all four types is driving a vehicle in the commission of an unlawful act not amounting to a felony or driving a vehicle in the commission of a lawful act which might produce death in an unlawful manner. The offense is a misdemeanor with a maximum sentence of one year in the county jail. (Pen. Code, § 193, subd. (c)(2).) Thereafter, the subdivisions add additional requirements with a corresponding increase in the penalties. Thus, if the act was done with gross negligence the vehicular manslaughter may be a felony and, if so, the penalty is imprisonment in state prison for two, four or six years. (Pen. Code, §§ 192, subd. (c)(1), and 193, subd. (c)(1).)

Here, the trial court, after defining the crime of vehicular manslaughter, properly instructed that if the jury found defendant guilty of manslaughter it must also find "whether the act causing death was done with or without gross negligence." The court then properly defined the terms "negligence" and "gross negligence." The prosecuting attorney, rather than stating anything in closing argument that would have misled the jury, carefully emphasized the difference between the two levels of negligence and told the jury what it was required to find before a finding of "gross negligence" could be returned.[1] She distinguished the simple offense of speeding from conduct

---

[1] The prosecuting attorney argued in her closing argument as follows: "Now, if you find under the manslaughter section, then you *also* have to make a special finding as to whether or not this was committed with gross negligence or without. And all I can say to you is negligence is like running a stop sign accidentally and it's a $34.00 ticket, maybe even if you hit a car or kid it's manslaughter. Is that gross? Or evil purpose? No. It's carelessness. Was Mr. Pike just merely negligent or was he grossly negligent? Did he have an appreciation for what he did? Did he do more than just the casual running of a stop sign or speeding? You bet. Did he do many things? Yes. Did he force cars off the road? Did he drive recklessly? Did he whip in and out of traffic? Did he reach speeds in excess of 80 to 85 miles an hour? You bet. Is that gross negligence? I think it is, very clearly.

"The Court gave you an instruction on gross negligence, and it talks about the fact, the exercise of such little care that you are justified in believing the person whose conduct was involved was wholly indifferent to the consequences of his conduct and the welfare of others. Was Mr. Pike indifferent? The only person he cared about was Mr. Pike, and he was having fun. He was laughing, he was smiling. He was enjoying it. Is that gross negligence? Yes, it is. Is it simple negligence? No. This is not the case of running a stop sign or going too fast in the

amounting to gross negligence and informed the jury that the former was only negligent conduct. She also indicated to the jury that driving recklessly would amount to gross negligence. We agree that if the jury found that the unlawful act causing death was defendant's reckless driving, that finding, in and of itself, would support the finding of gross negligence.[2]

Under the circumstances of the instant case, therefore, we find no error in the trial court's instructions regarding gross negligence.

## II

*Did the trial court correctly and adequately instruct the jury on the doctrines of proximate cause, concurrent causes and contributing cause?*

Defendant makes an assault on three California jury instructions (CAL-JIC Nos. 8.55, 8.90 and 8.93) contending that they are erroneous on the issue of proximate cause, concurrent causes and contributory negligence. Defendant concludes that the giving of these instructions was prejudicial error requiring reversal of defendant's conviction for involuntary manslaughter. Each contention will be discussed below.

### A. *Proximate Cause*

In several of the instructions given, the trial court defined the proximate cause of a death as follows: " . . . proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred." (CALJIC No. 8.55; CAL-JIC No. 8.90; CALJIC No. 8.93.)

Defendant contends that this definition of proximate cause is erroneous under well settled principles of law because it defines only cause in fact or actual cause, not proximate cause. We reject this contention for the following reasons.

First, defendant fails to cite any authority which has held that the quoted instruction defines only actual cause or that it fails to define proximate cause.

---

fog and rearending somebody. This is done with a total disregard for your conduct and the life and property of others." (Italics added.)

[2] CALJIC No. 16.840 was read to the jury as follows: "Every person who drives a vehicle upon a street or highway in willful or wanton disregard for the safety of persons or property, is guilty of reckless driving, a misdemeanor.

"The word 'willful,' as used in this instruction, means an intentional disregard for the safety of others. It is not necessary to establish an intent to injure some other person or property.

"The word 'wanton' as used in this instruction includes the elements of consciousness of conduct, intent to do or omit the act in question, realization of the probable injury to another, and reckless disregard of the consequences."

Second, although defendant does discuss the distinction between actual cause and proximate cause, there is no analysis which provides a basis for the conclusion that the instruction defines actual cause but not proximate cause.

Third, defendant not only fails to suggest an instruction which would "correctly define" proximate cause, but fails to provide even a clue as to how the CALJIC instruction could be improved upon.

Finally, an analysis of the quoted instruction indicates that defendant's contention cannot withstand scrutiny.

Defendant is incorrect in his contention that the CALJIC instruction merely defines actual cause. Such an instruction would state as follows: "The actual cause of a death is a cause which produces the death and without which the death would not have occurred." What distinguishes proximate cause from actual cause as just defined is that in addition, the death must be produced in a natural and continuous sequence by defendant's conduct. Natural indicates that it must be "normal or usual: in the ordinary course of events [a *natural* outcome]." (Webster's New World Dict. (2d college ed. 1982) p. 947.) It also requires that the death be "produced or existing in nature; not artificial or manufactured" (*ibid.*), thus excluding unexpected and unnatural deaths. Furthermore, the requirement of "continuous" sequence limits application "to that which extends without interruption in either space or time." (*Id.* at p. 307.) This comports with the dictionary definition of "proximate" and excludes deaths which are only remotely produced. Thus, the proximate cause definition which was given the jury adequately "limits or ends the linking of numerous 'but-fors'" which concerns the defendant in this case.

## B. *Concurrent causes*

The trial court instructed the jury regarding concurrent causes of death as follows: "There may be more than one proximate cause of a death. When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each of said persons is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death." ■ Defendant maintains that this instruction misstates the law regarding a finding of proximate cause when two or more persons act concurrently. Specifically, defendant contends that an actor's conduct is a proximate cause only if it was a substantial factor contributing to the death (relying on *People* v. *Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274]) and here, the jury was not

informed that defendant's conduct must be a substantial factor in the death of Officer Esquibel in order to be a proximate cause of that death.

In *People* v. *Caldwell, supra,* 36 Cal.3d 210, the California Supreme Court discussed causation in the context of a defendant's liability for the death of his crime partner who was shot by a police officer. In that case, Belvin (the murder victim) and Washington held up a Church's Fried Chicken restaurant and Caldwell drove the getaway car. Following a high speed chase by four sheriff's cars, the getaway car stopped and a shootout ensued. During the shootout, Belvin was shot by one of the deputy sheriffs. Washington was convicted of first degree murder, and Caldwell was convicted of second degree murder. (*Id.,* at pp. 214-216.) Defendants asserted "that it was Belvin's act of pointing a gun out the window of the car that precipitated the deputies' fire, and that they themselves did nothing which could be characterized as likely to result in death." (*Id.* at p. 217.) Since they could not be held liable for Belvin's malicious conduct (*People* v. *Antick* (1975) 15 Cal.3d 79, 90-91 [123 Cal.Rptr. 475, 539 P.2d 43]), defendants insisted that the murder convictions could not stand. (*People* v. *Caldwell, supra,* at p. 217.) Thus, as framed, the issue before the Supreme Court was whether defendants were the actual or but-for cause of their accomplice's death. The high court stated: "To be considered a *proximate* cause of Belvin's death, the acts of the defendants must have been a 'substantial factor' contributing to the result. (See *People* v. *Scola* (1976) 56 Cal.App.3d 723, 726 [128 Cal.Rptr. 477]; Perkins & Boyce, Criminal Law, *supra,* at pp. 779-780; see also *People* v. *Vernon* (1979) 89 Cal.App.3d 853, 864 [152 Cal.Rptr. 765] [a number of defendants concurrently contributed to victim's death by kicking].) '[N]o cause will receive juridical recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result. This is merely a special application of the general maxim—"*de minimis non curat lex*" . . .' (Perkins & Boyce, *supra,* at p. 779.) The fact that one of the deputies who testified was primarily concerned about Caldwell's actions after the car stopped and their inferential importance to Belvin, and that another reacted to Washington's brandishing of the shotgun, militate in favor of recognizing said acts as a substantial factor in bringing about the gun battle and Belvin's death.

"Decisions in cases involving conduct of more than one co-felon acting in concert reflect the settled view that *the extent of an individual's contribution* to the resulting death need not be minutely determined." (*People* v. *Caldwell, supra,* 36 Cal.3d at pp. 220-221, last italics added.)

Although the Supreme Court used only the word "proximate" cause, it appears clear that the court was discussing the actual cause aspect of the

"legal" definition of proximate cause. As noted by Perkins: "The substantial factor test has been said to be useful only to determine the fact of causation. Perhaps the statement should be that it serves to emphasize common sense and rule out purely theoretical abstractions. . . . However it is expressed, the substantial factor test is one of exclusion only. What was not a substantial factor in causing harm was not a proximate cause thereof. What was a substantial factor may have been a proximate cause—or it may not." (Perkins on Criminal Law (2d ed. 1969) p. 696, fn. omitted.) Thus, once it could be established that Caldwell's and Washington's personal conduct were at least a substantial factor in the actual cause of the police officers' decisions to shoot, proximate cause involved the simple determination of whether Belvin's death was a natural and continuously sequential result—a foregone conclusion in that case. Using this standard, the majority concluded the evidence was sufficient to support defendants' convictions for murder. Justice Bird dissented, agreeing with defendants that Belvin's own pistol pointing could be the only cause for the police officers' responsive shooting. (*People* v. *Caldwell, supra,* 36 Cal.3d at p. 230.)

It is important to note that the correctness or sufficiency of the jury instructions on the issue of causation was not an issue in *Caldwell*. Instead, it is clear from the posture of that case and the court's holding that defendant's contention herein must be rejected. The question in *Caldwell* was whether the conduct of each of the defendants was a substantial factor contributing to the resulting death of Belvin. If so, their conduct could be considered a concurrent, proximate cause of the death. Thus, had defendants conceded that their conduct in any way was a concurrent cause of the officers' responsive shooting, there would be no issue left to resolve. As the Supreme Court noted in *Caldwell,* "Decisions in cases involving conduct of more than one co-felon acting in concert reflect the settled view that the extent of an individual's contribution to the resulting death need not be minutely determined." Therefore, former CALJIC No. 8.93 correctly stated that "When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each of said persons is a proximate cause of the death regardless of the extent to which each contributes to the death." (See *People* v. *Vernon* (1979) 89 Cal.App.3d 853, 864 [152 Cal.Rptr. 765].)

Defendant also points to BAJI No. 3.76 which states: "Legal Cause— Definition of [¶] A legal cause of [injury] [damage] [loss] [or] [harm] is a cause which is a substantial factor in bringing about the [injury] [damage] [loss] [or] [harm]." However, the use note indicates that this instruction should be given where the "injury may have resulted from either of two causes operating alone." Such an instruction would have been improper in the instant case because there was not more than one cause which operated

alone in bringing about the death. Officer Esquibel's negligence could not be considered to have operated alone in causing his death because, but for defendant's conduct, Officer Esquibel would not have been driving negligently. At most, his conduct was a concurring cause of his death.

Moreover, defendant's erroneous conclusion that the proximate cause definition given by the court was in error appears to have led him to detrimentally argue that less is more. Defendant argues that the court should have given a proximate cause definition similar to BAJI No. 3.76 on legal cause instead of the one given. However, it is clear that BAJI No. 3.76 would require a lesser causal showing than the proximate cause definition. BAJI No. 3.76 only requires that the jury find that defendant's conduct was a cause which was a substantial factor in bringing about the death rather than a finding that the conduct was a cause which "in natural and continuous sequence, produces the death, and without which the death would not have occurred."

Thus, contrary to defendant's contention, the giving of the challenged proximate cause instruction rather than the legal cause or "substantial factor" instruction actually increased the prosecution's quantum of proof.

## C. *Contributing cause*

The trial court instructed the jury as follows: "It is not a defense to a criminal charge that the deceased or some other person was guilty of negligence, which was a contributory cause of the death in the case." (CALJIC No. 8.56 (1979 rev.).) ■ Defendant boldly asserts, without citation to authority, "this instruction misstates the law because the contributory negligence of a third party or the deceased may constitute a superseding cause in which case that negligence is a superseding cause and the defendant is not liable for the results." There is, of course, ample authority that the instruction is a correct statement of law. (1 Witkin, Cal. Crimes (1963) §§ 252, 347, pp. 234, 318-319, and cases cited therein.)

Defendant goes on to contend that not only is CALJIC No. 8.56 erroneous, it also negates the court's instructions on superseding causes.[3] Contrary

---

[3] The jury was also instructed as follows: "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of the defendant's original act and [*sic*] the intervening act is dependent and not a superseding cause and will not relieve defendant of liability. The consequence need not have been a strong probability, a possible consequence which might reasonably have been contemplated is enough. The precise consequence need not have been foreseen. It is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act. An intervening act may be so discon-

to defendant's contention, CALJIC No. 8.56 did not negate the court's instructions on superseding cause. It correctly informed the jury that defendant could not escape liability for his grossly negligent conduct proximately causing the death by showing that the victim or some other party was also negligent. If the jury concluded that defendant's grossly negligent conduct was a proximate cause of Esquibel's death, no further analysis was required. The fact that the jury might also have concluded that the conduct of another person, whether simply negligent or grossly negligent, was a contributory cause of the death could not relieve defendant of culpability. Only when the defendant's grossly negligent conduct is a remote cause, and the negligent or reckless conduct of the victim or other party is the sole proximate cause of the death, will the defendant be relieved of culpability. (See *People* v. *Harris* (1975) 52 Cal.App.3d 419, 426-428 [125 Cal.Rptr. 40]; 1 Witkin, Cal. Crimes, *op. cit. supra,* §§ 252, 347, pp. 234, 318-319.)

In the case at hand, we conclude that the giving of CALJIC No. 8.56 was not error and could not have misled the jury.

### III

*Is there sufficient evidence that defendant's gross negligence was the proximate cause of the officer's death?*

 Defendant contends that, even assuming arguendo that his conduct in driving the motorcycle was grossly negligent, the evidence is insufficient to support the jury's finding that his gross negligence was the proximate cause of Officer Esquibel's death. This contention is totally without merit.

 In reviewing a claim that the evidence is insufficient to support a conviction, an appellate court must review the record in the light most favorable to the judgment and presume in support of the judgment every fact the trier of fact could reasonably deduce from the evidence. If, when so viewed, it appears that no reasonable trier of fact could have found each element of the crime proved beyond a reasonable doubt, the judgment must be reversed. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Whether a reasonable trier of fact could have found that an element of the crime was proven beyond a reasonable doubt turns on whether substantial evidence of that element exists in the record. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

nected and unforeseeable as to be a superseding cause, that in such a case the defendant's act will be a remote and not a proximate cause."

 Here, defendant contends that "The evidence indicates that the chase, accident and ensuing fatality were based solely on [defendant's] commission of traffic violations discovered prior to the accident. All the evidence pointed to the conclusion that the officers planned to chase [defendant] until he was caught: his driving on [Highway] 198 was not the 'but for' cause of the accident, and no substantial evidence supports the jury's finding in this regard." Not so.

"Although defendant's own unlawful act must be a proximate cause of the death, negligence on the part of the victim is not a defense to criminal liability. [Citations.] Moreover, defendant's conduct can be a proximate cause of a death even where death results from collision with a third vehicle. [Citations.] The determination of whether defendant's unlawful act or acts were a proximate cause of the death is a question for resolution by the trier of fact [citation] and is determined according to the ordinary principles governing proximate causation. [Citation.]

"A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '(1) The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. (2) The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" (*People* v. *Harris, supra,* 52 Cal.App.3d at pp. 426-427, fns. omitted.)

In the instant case, the evidence adduced at trial indicates that defendant operated his motorcycle in an unlawful and reckless manner on public streets for approximately 10 miles in an effort to evade law enforcement officers who, using emergency sirens and red lights, tried to apprehend him. Defendant's speed at times reached 100 miles per hour. As held in *People* v. *Harris, supra,* 52 Cal.App.3d at page 427: "It was reasonably foreseeable that the officers would continue to chase him as he speeded recklessly and circuitously over public thoroughfares and failed to stop at boulevard stops, thus setting in motion circumstances creating peril to others on the public streets and a high probability that collisions, injuries and deaths would occur in the course of the chase."

Defendant's grossly negligent acts consisted of his seeking to elude the pursuing law enforcement officers by charging through traffic at extremely high speeds. Had defendant stopped as he should have, the accident would

not have occurred. Instead, his persistent attempt to escape brought about just what would be expected: pursuit by more officers. The speeds, places, conditions and methods of driving were primarily dictated by defendant; he chose the route and speeds. Predictably, the officers chose to follow suit, keep him in view and apprehend him when he stopped or was stopped. The probability that this might result in one or both of the officers losing control and/or colliding with another vehicle or some object is sufficient to establish that defendant's conduct was a cause that, in natural and continuous sequence, produced Officer Esquibel's death and without which that death would not have occurred. (*People* v. *Harris, supra,* 52 Cal.App.3d at p. 427; see also *People* v. *French* (1978) 77 Cal.App.3d 511, 523-525 [143 Cal.Rptr. 782].)

The judgment is affirmed.

Hamlin, Acting P. J., and Thaxter, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.