John George **PASCHAL**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 18874.

United States Court of Appeals
Fifth Circuit.

July 25, 1962.

Euel A. Screws, Jr., Montgomery, Ala., for appellant.

John L. Briggs, Asst. U. S. Atty., Jacksonville, Fla., Edward F. Boardman, U. S. Atty., Miami, Fla., for appellee.

Before HUTCHESON, CAMERON and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

John George Paschal was tried under a five count indictment for the alleged crime of passing five twenty-dollar bills in violation of 18 U.S.C.A. § 472. The jury returned a verdict of guilty on all five counts and the court sentenced the defendant to ten years imprisonment. His motion for a new trial was denied and he prosecutes this appeal in forma pauperis pursuant to the provisions of 28 U.S.C.A. § 1915.

The defendant, John George Paschal, a twenty-two year old man, was a resident of New Jersey and he was an automobile mechanic by occupation. He had held the rank of Specialist Third Class in the Army and was stationed in or near Orleans, France for a substantial time during service. About a month after release from the service, he, his mother, and fifteen year old brother made a trip to Florida because of his mother's ill health. When the trip began, Paschal had $400.00 cash in mixed denominations, his mother about $150.00, and his brother about $55.00. Upon arrival in Daytona Beach, Florida, the three checked into the Garrison Terrace Motel.

For the next week to ten days the family visited the beach quite often, went swimming, ate in various restaurants, visited neighboring towns and conducted themselves generally as tourists. The mother, who suffered from arthritis, im-

proved to such an extent that the family group concluded to stay in Daytona Beach, at least temporarily, and the younger brother enrolled in high school there.

On the afternoon of December 3, 1958, after the family had been in Daytona for about two weeks, Paschal went to Sears & Roebuck to buy a sweater and pair of pants. The purchase came to approximately $14.00 or $15.00. Paschal paid the salesman with a twenty dollar bill. The salesman had been alerted by the Assistant Manager to check on twenty dollars bills, since it was thought there were counterfeit twenties being passed in that area. The salesman checked the serial numbers on the bill given to him by Paschal with the numbers on the list furnished to him. They were the same. The Merchandise Manager, Assistant Manager and store detective were alerted and they also checked the serial numbers against the list. In addition to the identity of the numbers, the bill appeared to be "a little faded". A detective was called who took Paschal to the police station and after some interrogation, Paschal was arrested.

There were four other purchases with counterfeit twenty dollar bills which were traced to the defendant, Paschal. On December 2, 1958, he bought a sweater and pair of slacks for a young lady which cost about $18.00 and he presented a counterfeit twenty in payment. On the same day he purchased a recapped tire and paid for it with a counterfeit twenty. On November 28, 1958, Paschal obtained change for a counterfeit twenty for the purpose of making a long distance call to New Jersey. On November 29 or 30, 1958, he bought gas at a filling station and presented a counterfeit twenty in payment for the gas.

At the trial of the case there were no serious contentions that the money was not counterfeit nor that the defendant actually passed the bills, but rather that Paschal did not know the bills to be counterfeit, hence lacking the statutory requirement of knowledge and intent. Paschal claimed that he could have come upon the counterfeit money from his bank account in New Jersey or from a dice game in which he engaged at a motel in Daytona from which he carried away seven twenty dollar bills which he did not have previously.

At the beginning of the trial, after the jury had been sworn and qualified, the court proceeded to examine them as to their particular qualifications and especially to determine if any of them were prejudiced. The court then proceeded to discuss the power of Congress to coin money, punish counterfeiters and discuss the indictment in some factual detail. The court described this as "a big power", and commented upon the fact that "We have about 31 billion dollars in circulation". Each member of the panel stated that he could render a verdict which he honestly believed would be proper under the law and evidence. Counsel then proceeded to examine the first twelve jurors on voir dire and four were excused by the parties. Four additional jurors were called to take the place of the four who were excused. Juror Penney, the last one to be questioned, volunteered in the presence of all members of the jury that he was a stockholder and director of the Florida Bank & Trust Company of Daytona Beach; and he then stated in the presence and hearing of the jurors that the bank got "Some Paschal money"—"This defendant's money", about three years previously.[1]

---

1. "MR. BRIGGS: Mr. Penney?
    "MR. PENNEY: Yes, sir.
    "MR. BRIGGS: You are from Daytona Beach, is that right sir?
    "MR. PENNEY: Yes, sir.
    "MR. BRIGGS: And you are a realtor down there? Is real estate your business?

"MR. PENNEY: Real Estate broker. Perhaps I should say at this time that I am also a stockholder and director of one of our banks in Daytona Beach.
    "MR. BRIGGS: Which bank is that, sir?
    "MR. PENNEY: Florida Bank and Trust Company. My recollection is that

Counsel for Paschal approached the bench and moved the court to dismiss the jury panel because of these highly prejudicial remarks and suggested that it would save "a lot of time and effort if we start with a new jury panel". Mr. Briggs, who asked the questions of Juror Penney, was the prosecuting attorney. The court responded as follows:

"I think that there is no poison there that can't be removed. If I thought there was, of course I would dismiss the jury, but I don't think so."

The court dismissed Juror Penney and another juror was called to take his place. That jury was accepted.

We cannot agree that there was "no poison there that can't be removed". It is difficult to see how a remark could be more prejudicial. Jurors are generally conscientious and sincere citizens devoted to the task imposed upon them by law. Difficult decisions involving the life and liberty of accused persons is their task in criminal cases. They must resolve close questions involving the best interests of society and the innate desire to convict the guilty and release the innocent. When one of their own number comes forward with the conclusion of guilt based upon some special information or knowledge he has gained, in this case because the juror was a stockholder and director of a bank, the influence on the minds of the other jurors is inevitable. Such statements appear in the guise of *the real truth*. No one would claim that such a statement would be admissible in evidence even if it were "tempered by protective procedures". It is our judgment that neither judge nor counsel, though possessing the gravest wisdom of the wise, could effectively eradicate the impact of such an occurrence. Like the

sound of a bell, the words of Juror Penney continued to vibrate in the memories of the jurors present whether they realized it or not. Nothing could undo what his words had done.

In Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, the court was considering the publication of certain newspaper articles which occurred during the trial of the defendant. The trial judge on learning that prejudicial news accounts had reached the jurors, called them into his chambers one by one and interrogated them about the news stories. Three jurors had read one story; one had read two; two had scanned one; and one had scanned two. Each of the seven jurors convinced the trial judge that he would not be influenced by the news articles, but could decide the case on the record evidence only, devoid of prejudice against the defendant. The trial court was convinced and denied a motion for a new trial. Although the Supreme Court recognized the large discretion of the trial court in such circumstances, it concluded that, " * * * each case must turn on its special facts". The case was reversed because:

"The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence."

We believe fellow jurors would be more impressed with a statement of guilt by one of their own number, though innocently made, than they would be by a newspaper account of some former occurrence. Recently, in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, the Supreme Court reiterated the requirement that a jury be composed of

we got some Paschal money three years ago.

"MR. BRIGGS: You got some what?

"MR. PENNEY: Some Paschal money.

"MR. BRIGGS: Pasco money?

"MR. PENNEY: This defendant's money.

"MR. BRIGGS: Oh, Paschal's money, yes, sir, Paschal's money. All right, do you have any direct knowledge about the facts of this case?

"MR. PENNEY: No, other than what I recall having seen in the paper at the time and heard the discussion in the bank that there were a series of twenty-dollar bills being distributed."

a panel of impartial and indifferent jurors.

We cannot attach great significance to the fact that Paschal's attorney subsequently accepted the jury as satisfactory. What else could he have done? The trial judge had clearly indicated that the trial must proceed. Counsel for the defendant could not, as a practical matter, accuse the jury of being prejudiced when it was apparent to him that the trial must go on.

The foregoing is not the only prejudicial occurrence which transpired during the trial. The Government called as its witness a Mr. R. M. McDavid, a secret service agent of twenty-six years experience, one of whose principal responsibilities was the investigation of counterfeit money. He had investigated this case in and around Daytona Beach. He identified the five bills in question, and testified that he had examined them in detail at a previous time. Over strenuous objection, witness McDavid testified that he had seen twenty-five additional counterfeit bills in the Daytona Beach area during the time Paschal was present very similar to the five in evidence, which were the subject of the indictment.[2]

Without any testimony that he had personal knowledge of the history of the manufacture of the bills in question, McDavid testified as to their classification, manufacturing history, type of plates used, variation of the plates, place of origin and the appearance of similar notes in other places in the United States.

On cross-examination, McDavid admitted that a great part of his testimony came from the confidential records of the Government prepared by other agents, and a portion of his information about the additional twenty-five bills came from other agents who had talked to other people, the victims of the bills. Also on cross-examination, counsel for Paschal asked McDavid whether his investigation revealed that any of these bills turned up from New Jersey during the months of November and early December. The witness testified that of the additional twenty-five bills referred to, eighteen were traced to places where the defendant had been identified as having been in such establishments on the same day that the bills were passed.[3] McDavid stated that this information was based on personal investigation that defendant was identified at these places on the day when the bills were passed and on information received from other agents. Counsel objected to this testimony on the basis that it was hearsay and highly prejudicial and also moved for a mistrial which was overruled. The court allowed this whole line of testimony on the ground that McDavid could so testify as an expert.

Much of the testimony of McDavid was hearsay which was not admissible. He stated facts which were not

---

2. "Q. And from where did they come, what area?

"A. They came from the Daytona Beach area from a period commencing November 24, 1958 through December 3rd, 1958. There were a number of the remaining twenty-five similar notes through the course of investigation, a good portion of which I personally attended to, a portion of which I assisted the investigating agent where the notes were traced to establishments, victim establishments. * * * "

3. "Q. Mr. McDavid, in connection with your investigation of this case, you have testified that there were a number of notes that you—that turned up around Daytona Beach. Did you conduct any investigation or did your investigation reveal that any of these notes turned up from New Jersey to Daytona during the month of November or early portion of December?

"A. No, sir, Mr. Counsellor, but there was an investigation conducted which the question you asked me as to these other notes. Of the other twenty-five notes, I would say that possibly eighteen of them were traced to places where the defendant had been identified as having been in that establishment or drive-in on the same day that a note was passed there. We were unable to have him identified as the passer of the note but he was in that establishment on the date that the note was passed." (Tr. p. 322)

based on his own personal knowledge, but constituted a mere repetition of what he had been told or advised by another. In effect, he admitted that some of his testimony was not grounded on his own knowledge, but was based on what others had told him. Culwell v. United States, (5 Cir., 1952) 194 F.2d 808; Wharton's Criminal Evidence, § 249, p. 571. The trial court concluded that witness McDavid was an expert. Regardless of qualifications however, it is generally agreed that testimony of an essentially factual nature should not be predicated on the opinions, inferences and conclusions of others. Manufacturer's Accident Indemnity Co. v. Dorgan (6 Cir., 1893), 58 F. 945, 22 L.R.A. 620. United States v. Campanaro (D.C.E.D. Penn., 1945), 63 F.Supp. 811, in a prosecution for possessing counterfeit government obligations with intent to defraud, testimony by an agent that similar counterfeit bills had been circulated previously and had first appeared at a place where the accused visited, was held inadmissible as hearsay. Such testimony was also based upon records prepared by others.

"The purpose of the question and answer was to establish the fact that similar counterfeit bills had been previously circulated and had first appeared at a place where defendant visited and at a time when he was there. The truth of this fact depended on the veracity of those who had received the bills and on the veracity of the government agents who had investigated the matter and entered the information in the government records. As offered in evidence, the testimony did not permit defendant to test the truthfulness of these persons by cross-examination. For this reason Agent Gruber's testimony was hearsay and inadmissible."

█ There is no doubt that this testimony by McDavid was damaging to the defendant, bearing heavily upon the question of intent which was defendant's sole defense. The inference from the testimony is that the defendant passed a number of other counterfeit twenty-dollar bills in addition to the five in question. The truth of this fact depended on the veracity of those who received the bills and of those agents who had investigated the matter and entered the information upon the government records. As was previously inferred, cross-examination of McDavid did not permit the defendant to test the truthfulness of these facts and was consequently inadmissible. The judgment is reversed and the case is remanded for a new trial.

Reversed and remanded.