Filed 3/27/13  P. v. Cuevas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036928 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC786779) |
| v. | |
| MARCOS ANTHONY CUEVAS, | |
| Defendant and Appellant. | |

The Santa Clara County District Attorney charged Marcos Cuevas (appellant) with the October 29, 2007 murder of David Holguin.  In the information, filed on October 16, 2008, it was alleged that appellant personally and intentionally discharged a firearm killing Holguin, who was not an accomplice (Pen. Code, § 12022.53, subds. (b),(c) & (d)); and that the offense was committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)).  The information contained two special circumstance allegations; one, murder by means of lying-in-wait (Pen. Code, § 190.2, subd. (a)(15))[1] and two, the murder was carried out while appellant was an active participant in the criminal street gang Varrio Peligrosos Locos (VPL) and was carried out to further the activities of the gang (Pen. Code, § 190.2, subd. (a)(22)).[2]  In addition, appellant was

---

[1]    In reality the information used the language "while lying in wait."

[2]    Appellant was charged along with a codefendant Ephantus Kimani.  Kimani was charged as a principal in the offense.  However, On January 5, 2011, during jury selection

charged in a second count with being a felon in possession of a firearm (§ 12021, subd. (a)(1), count three),[3] with an allegation that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd.(b)(1)(A)).

Following approximately seven days of testimony, the jury found appellant guilty of first degree "willful, deliberate, and premeditated murder, lying in wait murder or discharging a firearm from a vehicle murder";[4] the jury found true the allegation that appellant intentionally killed David Holguin while appellant was an active participant in a criminal street gang and the murder was carried out to further the activities of the gang; and found true the allegation that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist criminal conduct by the gang.[5]

On May 6, 2011, the court denied probation and sentenced appellant to life in prison without the possibility of parole. The court imposed but stayed a 10-year term on

Kimani pleaded guilty to murder; the court informed the prospective jurors that Kimani was no longer in the case.

[3] All unspecified section references are to the Penal Code.

[4] The jury was instructed that appellant was being prosecuted for first degree murder under three different theories—willful, deliberate, and premeditated murder, lying-in-wait-murder, and murder by discharging a firearm from a motor vehicle.

[5] The jury was unable to come to a decision on the lying-in-wait special circumstance allegation, and on the personal use of a firearm allegation attached to the murder count, as well as the felon in possession of a firearm count and the attached gang allegation. Accordingly, the court declared a mistrial as to the allegations and the felon in possession count. It does appear that the jury not being able to agree on the personal use firearm allegation and the felon in possession count is inconsistent with the prosecution's theory of the case that appellant was the shooter. However, "When a jury renders inconsistent verdicts, 'it is unclear whose ox has been gored.' [Citation.] The jury may have been convinced of guilt but arrived at an inconsistent acquittal [or in this case deadlock] 'through mistake, compromise, or lenity . . . .' [Citation.] Because the defendant is given the benefit of the acquittal [or dismissal following a jury deadlock], 'it is neither irrational nor illogical to require [him or] her to accept the burden of conviction on the count[ ] on which the jury convicted.' [Citation.] [Citation.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.)

2

the gang enhancement (§ 186.22, subd. (b)(1)(C)) "pursuant to . . . section 186.22, [subdivision] (b)(5)."[6] Relevant to this appeal, the court imposed but stayed a parole revocation fine of $220 pursuant to section 1202.45. Appellant filed a notice of appeal the same day he was sentenced.

On appeal, appellant contends that his murder conviction must be reversed because the trial court abused its discretion in violation of Evidence Code section 352 and his due process rights under the Fourteenth Amendment when it admitted cumulative gang evidence. Alternatively, if this court deems this challenge forfeited, he received ineffective assistance of counsel. In addition, the trial court abused its discretion in violation of his state and federal rights to an impartial jury when the court denied his motion to dismiss the jury pool after a prospective juror stated that he taught appellant in juvenile hall. Finally, appellant urges the court to strike the parole revocation fine. Respondent agrees that this court should strike the parole revocation fine since appellant was sentenced to life without the possibility of parole. We agree that the judgment must be modified to strike the parole revocation fine, but as so modified we affirm the judgment.

*Testimony Adduced at Trial*

On October 29, 2007, Aaron Cedillo was at his house with his friend of 10 years David Holguin. Cedillo and Holguin both lived in the Meadow Fair neighborhood. Neither Cedillo nor Holguin were gang members. Around 10 p.m. on October 29, after drinking some beer, the friends left Cedillo's house to walk to the 7-Eleven store about four blocks away. Holguin was wearing a grey and red 49ers sweater and blue jeans.

---

[6]     The California Supreme Court has suggested that the minimum parole eligibility provision of 15 years in section 186.22, subdivision (b)(5) was never intended to apply to persons sentenced to life without parole. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1010.)

3

Holguin and Cedillo stopped briefly at Holguin's house on Othello Avenue. Then, they continued to walk toward Rigoletto Drive into an area Cedillo knew was claimed by Norteños gang members who wore the color red. As the two reached the T-junction at Othello and Rigoletti, a white early 1990s Honda approached them. Someone in the car asked if they had any marijuana; in their experience this was a common question asked in their neighborhood. Holguin and Cedillo grabbed their pockets and said no. Cedillo was unconcerned and did not focus on the car until he saw it turn and come back toward them as they were walking on Rigoletto; the car's headlights were off. When Holguin and Cedillo stepped off the sidewalk at the white stop line at Aida and Rigoletto, the white car pulled up next to them. Cedillo became concerned that since they were in a bad neighborhood the people in the car might take their wallets or shoes.

Cedillo could see that the car had two occupants in the front and two in the back. The car stopped in front of Cedillo and about three to four feet from Holguin. As Holguin neared the right front fender of the car, the front passenger asked him, "Hey; homeboy. Do you bang."[7] Holguin bent forward to look into the car; he responded to the passenger's question by saying that he did not. Cedillo could see the front passenger who he described as a Hispanic male about 18 to 20 years old. Cedillo was able to see the passenger's face from the bridge of the nose down; the passenger had "chubby cheeks;" and a black jacket draped over his right shoulder, chest and arm. Cedillo testified that he thought the passenger sounded as if he wanted to fight. However, he heard some "chatter" and then a metallic sounding "click," which he associated with a gun. Cedillo pushed Holguin to the side and told him to run; Cedillo ran. Just as he reached a tree about 15 feet away and was crawling next to a truck, Cedillo heard a "bang, a pop" that sounded similar to a gunshot. At first Cedillo thought that Holguin had run away when he pushed him, but soon realized that Holguin had been shot and had fallen to the ground

---

[7]     Cedillo testified that it was either "Hey; homeboys. Do you bang," or, Hey; homeboy. Do you bang?

at the spot where Cedillo had left him. Cedillo saw the white car speed away down Rigoletto. Cedillo saw Holguin holding his chest; he was saying that he had been shot.

Cedillo ran to his friend and dragged him back behind the truck in case the car returned. Holguin was coughing up blood. Cedillo called for help, but no one was on the street. Cedillo told Holguin that he was going for help, as he did so Holguin grabbed Cedillo's sweater and told him not to leave him. However, Cedillo ran to Holguin's house, which was about a block and a half away. Cedillo told Holguin's parents that their son had been shot. Cedillo ran back to Holguin accompanied by Holguin's brother. When Cedillo got back to Holguin, people were beginning to gather around him; Holguin was by this time "foaming blood at the mouth." Holguin was moving a little but appeared to be not "really there." At trial, just as he had done at the preliminary hearing, Cedillo identified appellant as the shooter.

Officer Kalsbeek arrived on the scene at approximately 10:21 p.m. a few seconds ahead of other officers. Holguin lay in the street near the curb before paramedics arrived. Officers pulled Cedillo away from Holguin and moved people back to make a perimeter as paramedics began working on Holguin; at some point thereafter Officer Kalsbeek determined that Holguin was dead. Officer Kalsbeek asked if anyone had information about what had happened. When he determined that Cedillo had the most information he took his statement at the scene and then drove Cedillo to the police station. Before they left the neighborhood, Officer Kalsbeek showed Cedillo a car, to see if it was the one involved in the shooting, but it was a much newer model. According to Officer Kalsbeek, Cedillo was "very scared." On the way to the police station Cedillo appeared to be "very shaken up" and Officer Kalsbeek had to pull over so that Cedillo could vomit.

Later an autopsy of Holguin's body revealed the cause of Holguin's death to be a gunshot wound to the chest and the manner of death a homicide. A badly damaged spent projectile was recovered from Holguin's chest cavity. The projectile was turned over to

5

technicians; subsequently it was identified as a non-jacketed, straight lead, round nose .38 caliber bullet.

At approximately 10:32 p.m. on October 29, 2007, Alejandro Arzate was driving at approximately 60 m.p.h. northbound on Highway 101. As he neared the Old Oakland Road exit, a white Honda passed him on his left side; Arzate estimated that the car was being driven at 70 m.p.h. The Honda crashed into the center divider. Arzate pulled over to the side of the freeway to call 911. Although he did not see anyone get out of the Honda, he saw three people in hooded sweat shirts run across the freeway toward the exit ramp to Old Oakland Road; they reached the grass close to a fence. Arzate looked at his telephone to call 911; when he looked back up he saw the three people on the other side of the fence.

Officer Minh Le was dispatched to the crash site on 10:32 p.m. In English, Arzate described to the officer how the white Honda Civic had spun out and hit the center divider guardrail and three people had run across the lanes to the off ramp and jumped the fence onto Mabury Road. Arzate repeated his statement to a Spanish-speaking officer, Vincente Alvarez. Arzate used the word "cholo," to describe how the three people were walking as they crossed the freeway. [8] Later that evening Arzate talked to two detectives at the police station. Officer Le checked the 1991 white Honda Civic's license plate, which showed that it was a stolen vehicle whose registered owner was a Mark Babich. The check revealed that the vehicle was suspected of possibly being used in a homicide earlier that night. The Honda was held until detectives could determine if the car was a crime scene.

Metro PCS telephone records for appellant's cellular telephone number indicated a series of telephone calls that connected to a tower at 855 Mabury Road in San Jose on October 29 between 10:34 and 10:36 p.m. There had been no telephone calls to or from

---

[8] Officer Alvarez explained that "cholo" does not actually mean a gang member, but describes a type of person and the type of clothing they wear.

appellant's cellular telephone for an hour and a half before these calls. Mabury Road is the surface street that runs parallel to Highway 101 where Old Oakland Road goes under the freeway.

Homicide Detective Sergeant Kelly was dispatched to the scene of the shooting at Aida and Rigoletto to investigate. He became aware of the fact that a vehicle matching the description of the vehicle used in the homicide crashed on Highway 101. Since the homicide and the car crash occurred close in time,[9] Sergeant Kelly drove with Sergeant Boren from Aida and Rigoletto to the scene of the crash; it took them approximately seven to 10 minutes to get there. They walked to where the three people seen crossing the freeway fled, but were unable to find any evidence. They returned to the police station where Officer Kalsbeek had elicited from Cedillo a description of the front passenger in the Honda used at the shooting scene. Cedillo described the passenger in the Honda as an 18-20 year old Hispanic male with chubby cheeks and a "fade " haircut; he did not remember the man having any facial hair. Cedillo thought that he could identify the person again, but could not provide any assistance to a sketch artist. Cedillo's statement to Sergeants Boren and Kelly concerning the other people in the Honda was that they were young Hispanic males with shaved heads. During Cedillo's interview he was shown a photograph of the crashed Honda. After being told to ignore the damage to the vehicle, Cedillo said the car was similar to the one involved in the shooting.[10]

Mark Babich, the owner of the stolen Honda Civic, was employed at Cosentino's Market at Union and Bascom in San Jose. On October 29, 2007, he parked his Honda at the market around 10:00 a.m.; the car was in good condition. He reported the car stolen at 7:30 p.m. that evening. After the damaged car was processed by crime scene

---

[9]     The 911 call from David Holguin's father was made at 10:20 p.m. and the call from Arzate regarding the crashed Honda was made at 10:32 p.m.

[10]     Initially, Cedillo had said that the Honda had headlights that folded down, which Babich's car did not have. However, Cedillo testified that he was mistaken about the headlights.

7

technicians, Babich identified the car at the impound yard. His black Cosentino's Market jacket was in the front seat and other items belonging to him were in the car. However, he said that two car stereos found in the trunk were not his. Officer Kirby of the homicide crime scene unit obtained a fingerprint from one of these stereos.

When crime scene technician Dondi West processed the Honda on October 29, she saw writing in the residue on the windshield just above the steering wheel. The writing appeared to be a " '1' and a backwards '3.' " West lifted the writing with fingerprint tape. The writing was shown to Babich; he said that he did not make the mark. West testified that she received a gun from Officer Ruybel that she photographed. West identified a photograph that she had taken as depicting that gun; the gun was loaded with six bullets, which she photographed both in and out of the gun.[11]

Although Sergeants Kelly and Boren had a theory that gangs were involved in Holguin's death based on the fact that he was dressed in red and Cedillo's description of what happened, there were no leads in the case until November 2007. The officers received information from the Violent Crimes Enforcement Team (VCET) that a VPL gang member[12] known as "Frost," real name Marcos Navarro, wanted to give information that VPL gang member known as "Blue," real name Marcos Cuevas, had admitted to Navarro while they were both in jail that he murdered Holguin.[13] At the time that

---

[11]    The prosecutor argued to the jury that in one of the photographs of the gun they could see that one of the rounds was untarnished and the rest were not, which indicated that one round from the gun had been replaced. Defense counsel objected on the ground that this was speculation. However, the court overruled the objection. The court said that was an inference that the prosecutor could ask the jury to make.

[12]    Testimony from an expert on criminal street gangs, Detective Prescott, established that VPL is short for Varrio Peligrosos Locos. VPL is a Sureño criminal street gang tied to the Mexican Mafia; about a year after this shooting occurred, the gang had approximately 135 members.

[13]    Detective Prescott had compiled gang intelligence files on appellant and former codefendant Kimani containing field identification cards, reports, photographs and other research information. Appellant had admitted his Sureño gang membership four times starting in 2001. His most recent admission was a few weeks after Holguin's murder.

Sergeant Kelly received this information no reports of Cedillo's statements had been released. Sergeant Boren testified that the only way a person who was incarcerated on October 29, 2007, could have known the details about the shooting, was for that person to have been told them by someone present at the killing. Sergeant Kelly testified that the information Navarro provided could not have come from any police reports.

The VCET was directed to make contact with other VPL members they could find, especially those who might have weapons. Sergeants Boren and Kelly set up a confidential investigation and on November 6, a photographic line-up was generated that included an older photograph of appellant. In the photograph, appellant had a mustache. At the police station Cedillo viewed the photographs for a short time but was unable to make a positive identification of appellant as the shooter. Sergeant Kelly testified that Cedillo appeared to be visibly upset and physically worn out when he viewed the photographs.

After his initial debriefing statement to a VCET officer, Navarro was interviewed first by Sergeant Boren and VCET officers and then again by Sergeant Boren, but this time with Sergeant Kelly. Navarro related details about the shooting that sufficiently corroborated Cedillo's version of events such that it led the officers to believe that appellant was involved in Holguin's murder. Sergeant Kelly arrested appellant at the Elmwood jail on November 8th.

In addition to implicating appellant in the shooting, Navarro implicated Kimani (the former codefendant) in Holguin's murder.[14] On November 7, 2007, Officer Ruybal from VCET led a team that conducted a search of Kimani's residence. In the search,

_____

Appellant had VPL tattoos across his shoulder blades and upper back, VPL and X3 on his neck and three dots on his left wrist. Detective Prescott documented appellant's known Sureño associates and involvement in gang activity going back to when appellant was 13. Detective Prescott's expert opinion was that appellant was an active gang member on October 29, 2007.

[14] Detective Prescott identified Kimani as a VPL gang member.

officers seized blue jackets, shirts and jerseys, a blue photograph album, and two handguns, one of which was a .38 caliber Smith and Wesson.[15] Kimani was taken to the police station. During a telephone conversation that was recorded Kimani made several incriminating statements. He said that someone "from the barrio" had "snitch[ed]" him "out." He made a reference to "dos cuetes" or two guns and said he would be sent "straight to Africa" or get lots of time; if offered less he would take it.

On November 21, 2007, Santa Clara Crime Laboratory firearms expert Edward Peterson examined the .38 caliber Smith and Wesson recovered from Kimani's residence and the bullet fragments taken from Holguin's body. Peterson determined that Kimani's gun, or another gun in the same condition, of the same make and year, with a barrel produced in close sequence to Kimani's gun, fired the bullet found in Holguin's body.

Navarro testified at trial that he was in custody on charges of carjacking, armed robbery and evading the police. After intake on July 21, 2007, he was housed in a protective custody unit for Sureños and in an area for gang dropouts beginning on November 6, 2007. According to Navarro, appellant told him that he "blasted a Norteño" in retaliation for the killing of "Little Rascal" who was another VPL gang member. Appellant told him that there was a meeting among the VPL gang members at which $300 was collected and given to Kimani to purchase guns. Appellant said he told Kimani that he would do the "jalle" or job. Appellant told Navarro that on the day of the shooting, he and others went looking for a Norteño to kill; that he shot the Norteño in the chest once with a revolver, which might have been a .38 caliber gun; that the shooting occurred on Rigoletto Drive; that before the shooting he asked the victim whether he was a Norteño and asked for marijuana; that the victim was wearing a red jersey; and that he got the gun from Kimani and returned it to him after the shooting.

---

[15] This was the gun that Dondi West photographed.

San Jose Police Officer Greg Grothaus testified that in December 2008 he found a San Jose Police Department homicide crime report for this case in a vehicle belonging to Miguel Castanon.[16] The pages were part of the police report concerning Navarro's statements implicating appellant. A search of appellant's jail cell showed that his copy of the police report was missing the pages found in the car.

Nancy Marte, a DNA analyst at the Santa Clara County Crime Laboratory, compared samples taken from the seat belt clasp of the crashed white Honda with a buccal swab taken from appellant. The sample taken from the seat belt was a mixture of DNA from two or more contributors, at least one male, with Mark Babich excluded and appellant included as a possible contributor. Appellant was not excluded as a possible contributor from the single source, partial DNA profile taken from a hair root recovered from the right front floor of the Honda. Marte emphasized that statistical calculations did not meet minimum requirements for her to attribute the DNA to appellant to a degree of scientific certainty, but appellant could not be excluded from either sample. However, appellant was excluded from the "very large mixture" of DNA, which included at least one male, in a sample taken from the grip of the Smith and Wesson revolver.

Elaine Campoy, a certified latent fingerprint examiner with the San Jose Police Department, examined 18 latent fingerprint cards she received in this case. One of the highest quality prints came from one of the two stereos found in the trunk of the Honda Civic. The prints had enough points of identification to compare to prints in a database of everyone arrested in Santa Clara County. Campoy was asked to compare the prints from two people, one of whom was appellant, to the latent life cards. She compared the latent life card from the stereo and a card that contained appellant's fingerprints and found 17 points of identification; she characterized the latent lift print as "identical" to appellant's left middle finger on his rolled print card. Two other examiners, both of

---

[16] The vehicle had been involved in a traffic incident. Detective Prescott identified Castanon as a VPL gang member.

11

whom were unaware that Campoy had made an identification of the print from the stereo, drew the same conclusion.

Detective Prescott testified extensively on gang history, gang structure, including the links between the prison gangs—the Mexican Mafia and the Neustra Familia and their related street gangs—the Sureños and the Norteños, gang clothing, tattoos, graffiti and signs and symbols. He gave his opinion regarding the significance and consequences of disrespecting a rival gang and the requirement that in all gangs, gang members assault or even kill rival gang members on sight. There was considerable testimony on the role and importance of gang loyalty and trust and the strict prohibition—enforced by violence, on cooperating with the police; and how gang members gain status and power within the gang through length of membership and committing crime. Detective Prescott discussed six predicate offenses committed by VPL members.[17] In addition, he opined that appellant, Kimani, Castanon and several other individuals that he named were members of VPL or other associated Sureño gang members.

According to Detective Prescott, in October 2007, a neighborhood on the south side of San Jose known as Varrio Meadow Fair, which included streets named Aida, Enesco, King, Othello and Rigoletto were part of the territory claimed by Norteño street gangs associated with the Nuestra Familia. An area around Jeanne and Forestdale Streets north of Highway 280, near Highway 101, was home to VPL. In the period from 2003 to 2007, VPL gang members were responsible for a serious of violent crimes that included

---

[17]     To prove a gang is a "criminal street gang," the prosecution must demonstrate it has as one of its "primary activities" the commission of one or more of the crimes enumerated in Penal Code section 186.22, subdivision (e), and it has engaged in a "pattern of criminal gang activity" by committing two or more such "predicate offenses." (§ 186.22, subds.(e), (f); *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) A "pattern of criminal gang activity" is defined as "the commission of . . . two or more of [the predicate offenses], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

an attack on a group of Norteños and injuries to nightclub security guards who tried to separate the two groups. In addition, VPL and other Sureños were responsible for an assault on a group practicing for a quinceañera celebration that resulted in three stabbings; and VPL was responsible for two assaults with stabbings of Norteños victims, during which Sureño slogans were shouted. In 2004 Efren Cervantes, a member of a Sureños gang closely associated with VPL was convicted of first degree murder with gang enhancements in the shooting of a Norteño. According to Detective Prescott, Cervantes told his girlfriend he was going "buster hunting"—meaning a Sureño, looking for and finding a Norteño to kill. On September 22, 2007, five weeks before Holguin's murder, Juan Carlos Montoya, a 15 year old VPL gang member known as "Little Rascal" was killed—he was shot in the head on "VPL turf." Detective Prescott opined that appellant was an active VPL gang member and that Holguin's murder was done for the benefit of, at the direction of, or in association with the criminal street gang VPL and other Sureño gangs.

*Discussion*

*Alleged Cumulative Gang Evidence*

Appellant contends that his murder conviction must be reversed because the trial court abused its discretion in violation of Evidence Code section 352 and his right to due process under the Fourteenth Amendment when it admitted cumulative gang evidence.

At the outset we acknowledge that a great deal of gang evidence was presented in this case and that before and during Detective Prescott's testimony, defense counsel objected several times on the ground that some of the testimony was cumulative, which the court overruled;[18] Judge Brock agreed that defense counsel had a continuing 352 objection on the basis of cumulativeness to the prosecutor's questions of the gang

---

[18]     Given this record, we conclude that the issue is preserved for appeal and it is therefore unnecessary to address appellant's alternative argument that he received ineffective assistance of counsel.

13

expert.[19]  Indeed even Judge Brock told the prosecutor to "move on" because some of the gang evidence that was being presented was cumulative.

That being said, "[u]nder Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  [Citation.]  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125.)

" 'The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.  [Citation.]' [Citation.]  Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony.  [Citations.]  [¶]  The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.]  '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)  As a result, when evidence of gang activity or affiliation is relevant to motive, it may properly be introduced even if prejudicial. (*People v. Martinez* (2003) 113 Cal.App.4th 400, 413.)

---

[19]     Relevant to this issue, Detective Prescott's testimony spans approximately 250 pages of the reporter's transcript and involved the review of 150-160 slides; in total, the evidentiary phase of the trial spans approximately 1690 pages, which included some discussions between the court and counsel.  Thus, Detective Prescott's testimony was approximately 1/14th of the trial testimony.

To prevail on his argument that he was denied due process of law by the admission of cumulative gang evidence, appellant must show that the admission of the evidence was erroneous, and that the error was so prejudicial that it rendered his trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 436, 439.) " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." . . . ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230, fn. omitted.)

Appellant concedes that expert testimony is generally relevant and admissible to prove a gang enhancement allegation and a gang special circumstances allegation. Nevertheless, appellant argues, "[w]ith its seemingly endless parade of opinion and hearsay evidence about the violent gang culture—most of it not focused on VPL—the prosecution painted a vivid picture of extreme, uncontrolled violence in the midst of our community. The inevitable result, whether or not intended, was to fan the juror's fears of gangs, and to lead them to infer that gang members—including [appellant] have a propensity to commit violent crimes."

Appellant fails to acknowledge that the court properly instructed the jury that it was not permitted to consider the gang activity evidence to prove defendant has a bad character or is disposed to commit a crime. It is, of course, presumed the jury understood and followed the court's instruction in the absence of any showing to the contrary. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

15

According to appellant, absent some of the cumulative and irrelevant gang-related evidence,[20] under *People v. Watson* (1956) 46 Cal.2d 818, 836, he argues that it is reasonably probable that the jury would have returned a more favorable verdict because the case against him was weak since Cedillo's eyewitness identification of him as the perpetrator was questionable, and Navarro's testimony that he admitted shooting him was unreliable. In addition, under *Chapman v. California* (1967) 386 U.S. 18, 24, he argues that the People cannot prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained in his trial.

The introduction of *some* gang evidence was proper and unavoidable, given the close connection of the crime to appellant's gang membership and the pleading of a gang enhancement. In particular, it was relevant to establish the motive for what appeared to be a random act of violence. Here, the evidence relating to revenge for the killing of Little Rascal was relevant to the issues of motive and intent for the charged offense and was therefore properly admitted. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.)

However, assuming that the admission of a significant portion of the gang evidence was error, we are not persuaded by appellant's argument that the evidence against him was weak. Despite appellant's attempt to pick apart individual pieces of evidence and view them in the light most favorable to the defense, when taken together with all reasonable inferences to be drawn therefrom, the evidence of appellant's guilt was far from weak.

---

[20] Appellant contends that much of the gang expert's testimony had low probative value to prove the issues at trial. Specifically, he contends that the evidence about the prison gangs, the detailed and repetitive testimony about the symbols used by Norteños and Sureños, the purpose of tattoos and the fact that a non-gang member would wear a tattoo only on pain of violence, the lengthy list of violent crimes that gangs commit, the degree of cooperation among street gangs, the discussion of gang hierarchy and membership and the excessive number of predicate offenses, added little or nothing to the issue the jury was required to decide.

16

While each individual piece of evidence considered separately might not have convinced this court beyond a reasonable doubt that the admission of a significant amount of gang evidence did not contribute to the verdict in this case, taking all the evidence together does. Cedillo's eyewitness identification of appellant as the shooter was bolstered by appellant's admission to Navarro that he shot Holguin. The confession encompassed a level of detail that only the perpetrator could have known, and was given to a trusted gang member.[21] The seizure of the Smith and Wesson from Kimani, a weapon that was used in the shooting of Holguin[22]—further supports Navarro's testimony.

DNA evidence and fingerprint evidence along with reasonable inferences to be drawn from the evidence that appellant's cellular telephone connected to the tower at 855 Mabury Road between 10:34 and 10:36 p.m., placed appellant in the white Honda that crashed on Highway 101—the same type of car that according to Cedillo approached him and Holguin and from which the shot came. The fact that the car was speeding and crashed shortly after the shooting strongly supports the reasonable inference that this was indeed the vehicle used in Holguin's murder as does the fact that Babich's black jacket was found in the car.[23]

Finally, from its inability to reach a verdict on the lying-in-wait special circumstance and personal use of a firearm allegation attached to the murder count and

---

[21] Navarro testified that he had been a gang member since 1996 and that he was one of the older members of the gang.

[22] A reasonable inference to be drawn from Peterson's testimony is that this was the gun used in the shooting; for it to have been another gun, that gun's barrel would have had to have been manufactured in the same year, within close sequence (10 either side) to the barrel of Kimani's gun, using the same broach, and would have to be in exactly the same condition, not rusted or pitted. Needless to say, the jury was free to draw the conclusion that the chances that it was another gun used in the shooting were astronomical.

[23] Cedillo testified that the shooter had a black jacket draped over his right shoulder, chest and arm.

the remaining charge against appellant (felon in possession) and the allegation (benefit of a criminal street gang) that was attached to that count, it is plain that that the jury did not improperly consider the gang evidence. A reasonable conclusion to be drawn is that had the jury been swayed improperly by the gang evidence, it would also have found true the special circumstance and firearm allegation as well as the felon in possession charge and the gang enhancement on that charge.

Accordingly, we are convinced beyond a reasonable doubt that any alleged error in admitting the cumulative gang testimony was harmless.[24]

*Alleged Tainted Jury Pool*

Appellant contends that the trial court abused its discretion and denied him a fair and impartial jury by denying his motion to dismiss the "jury pool"[25] after a prospective juror stated that he thought he had taught appellant and his brother at a time when he worked in juvenile hall.

*Background*

On the second day of jury selection, during voir dire, the court asked juror number eight, J.K.,[26] about his past employment. J.K. told the court that before he became a teacher for the county office of education, he worked part time and full time for the

---

[24] Similarly, assuming that this did not rise to the level of federal constitutional error, under *People v. Watson*, *supra*, 46 Cal.2d 818 we are convinced that it is not reasonably probable that the jury would have returned a more favorable verdict in the absence of the cumulative gang evidence.

[25] Appellant clarifies that in fact he meant jury panel and not jury pool. " 'The jury "pool" is the master list of eligible jurors compiled for the year or shorter period from which persons will be summoned during the relevant period for possible jury service. A "venire" is the group of prospective jurors summoned from that list and made available, after excuses and deferrals have been granted, for assignment to a "panel." A "panel" is the group of jurors from that venire assigned to a court and from which a jury will be selected to try a particular case.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 581, fn. 7.)

[26] The juror was given the number 44, but he was in seat number eight. For ease of reference we refer to him as juror number eight or by his initials J.K.

18

county probation department as a counselor at juvenile hall for about two and a half years, but it was a very long time ago; in addition, he worked at the "boys ranch" as a teacher after he became employed with the Department of Education. Later, the court asked the panel of potential jurors if any of them recognized names from the witness list. J.K. said he thought that he recognized the name Christian Cuevas as being one of his ex-students. J.K thought that if it was the same person, Christian Cuevas would have been "about 20 or in his early 20's."

The next day defense counsel asked J.K. about his employment at juvenile hall and the boys' ranch. In answering her questions, J.K. told the court that he wished to clarify something. Specifically, he said that when he came into the courtroom he was not "clear on who the defendant" was. "He's also been one of my students, I believe, if it's the same one. There were two brothers." Defense counsel asked to approach the bench and an unrecorded bench conference ensued. Later, at the end of the afternoon session, defense counsel made a record of the unrecorded bench conference. Counsel stated that she made a sidebar challenge to the entire "venire" because J.K. had "spoken of the fact that [her] client was in juvenile hall, which means that the entire panel would have known that [her] client has a juvenile record."

At the beginning of the next court session, the court interview J.K. outside the presence of the other prospective jurors. J.K. stated that he had not recognized appellant's name when he first heard it, but now recognized it and remembered that appellant had been a student of his at the Muriel Wright Boy's Ranch. J.K. agreed not to mention that fact to anybody and agreed he could be fair. J.K. said that he did not remember any particular incidents involving appellant, either positive or negative. Defense counsel challenged J.K. for cause and reminded the court that she had challenged the entire panel because the prospective jurors now knew that her client had a juvenile record. The court took the matter under submission.

19

Eventually, the court dismissed J.K. for cause. However, following a hearing, the court denied the motion to dismiss the entire panel for cause. The court found that the jury panel had not been "significantly tainted" by the imprecise statement, especially in light of the panel's knowledge of appellant's prior convictions. Specifically, the court found that J.K.'s statement while "unfortunate" was a single statement and that the "area of inquiry" was "immediately cut off." The court found that in light of the "fairly egregious nature of the charges," the fact that appellant's prior conviction had already been mentioned, and the "fairly innocuous" comment by J.K., "the taint" was not "sufficient to excuse . . .the whole panel."

Appellant argues that the information J.K told the rest of the panel along with the knowledge that he had a criminal record conveyed to the jury that he had begun his criminal activities as a juvenile, thereby painting him as a recidivist whose propensity to commit crimes was evident even when he was young.[27]

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*).) " ' "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.]" (*Ibid.*)

"[T]he trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire [panel] to such an extreme that its discharge is required." (*People v. Medina* (1990) 51 Cal.3d 870, 889 (*Medina*).) Furthermore, "[i]t is within the trial court's discretion to determine that a prospective juror's statement was not prejudicial and thereby deny a defendant's motion

---

[27] The prospective jurors were already aware that appellant had a prior criminal record. They were read the charges, including the charge of felon in possession of a firearm, with an allegation that appellant had been convicted of automobile theft with a prior automobile theft conviction.

to dismiss the jury panel. [Citations.]" (*People v. Nguyen* (1994) 23 Cal.App.4th 32, 41.) "The conclusion of a trial judge on the question . . . is entitled to great deference and is reversed on appeal only upon a clear showing of abuse of discretion." (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1466.) "Just as a finder of fact is in a better position than the reviewing court to judge the credibility of a witness, the trial judge is in a better position to gauge the level of bias and prejudice created by juror comments." (*Ibid.*)

We will not reverse the court's determination unless the exercise of that discretion has resulted in a miscarriage of justice. (Code Civ. Proc., § 223.)

Discharging an entire jury panel is a remedy reserved for "the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending [jurors] would be insufficient protection for the defendant." (*Medina, supra,* 51 Cal.3d at p. 889.)

Appellant cites to two federal case, *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630, 633 and *Paschal v. United States* (5th Cir. 1962) 306 F.2d 398, 401, which he asserts provide persuasive authority to support his argument that the trial court should have dismissed the entire panel for cause.

We find appellant's reliance on *Mach v. Stewart*, *supra*, 137 F.3d 630 (*Mach*) to be unpersuasive. In *Mach*, a prospective juror in a child sexual abuse prosecution was a social worker with the State of Arizona Child Protective Services. The juror indicated before the entire jury panel that she would have a difficult time being impartial in that "sexual assault had been confirmed in every case in which one of her clients reported such an assault." (*Id.* at p. 632.) Further questioning established the juror "had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted." (*Ibid.*) The Ninth Circuit "presume[d]" the juror's comments "tainted" at least one juror, violating the defendant's right to an impartial jury. (*Id*. at p. 633.)

21

We find appellant's reliance on *Mach* misplaced.  "Decisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352.)  In addition, California law does not indulge in a presumption of jury taint or prejudice arising from a prospective juror's remarks as the Ninth Circuit did in *Mach*.  (*Medina*, *supra*, 51 Cal.3d at p. 889 [the trial court possesses broad discretion to determine whether or not possible bias or prejudice against the defendant has contaminated the entire venire to such an extreme that its discharge is required.  Such a drastic remedy is not appropriate as a matter of course merely because a few prospective jurors have made inflammatory remarks].)  We are bound to follow the principles enunciated by our state's highest court.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Finally, *Mach* is factually distinguishable.  J.K.'s statement that appellant *might* have been a student of his is not comparable to an unequivocal assertion by a social worker that children do not lie about being sexually assaulted.

Similarly, we find appellant's reliance on *Paschal v. United States*, *supra*, 306 F.2d 398 (*Paschal*) unavailing.  In *Paschal*, the defendant was charged with passing counterfeit bills.  During voir dire, a prospective juror stated that he was the director of a bank and had in the past personally seen " 'Some Paschal money' . . . .  'This defendant's money[.]' "  (*Id.* at p. 399.)  The Fifth Circuit Court of Appeals held that even though the director was excused, the final jury was irreparably tainted.  The court explained: "When one of their own number comes forward with the conclusion of guilt based upon some special information or knowledge he has gained, in this case because the juror was a stockholder and director of a bank, the influence on the minds of the other jurors is inevitable." (*Id.* at p. 400.)  Here J.K. did not profess to have any personal knowledge about whether appellant was actually guilty of the charged crimes.

This case is more akin to *People v. Henderson* (1980) 107 Cal.App.3d 475 (*Henderson*) and *People v. Vernon* (1979) 89 Cal.App.3d 853 (*Vernon*).  In *Henderson*, a

22

case in which the People sought to extend the defendant's commitment as a mentally disordered sex offender (*id*. at p. 480), a prospective juror revealed the defendant had been her client in psychotherapy " 'this year.' " (*Id*. at p. 493.) The prospective juror was excused but the defendant moved to dismiss the entire panel and argued the jury was prejudiced by her remarks. The *Henderson* court held the trial court did not abuse its discretion in declining to dismiss the panel. (*Ibid*.) In *Vernon*, prospective jurors were asked if anyone close to them had been a crime victim. A prospective juror responded that the defendant "had been tried for raping her niece." (*Vernon, supra,* 89 Cal.App.3d at p. 865.) The court immediately excused the prospective juror on its own motion and continued with voir dire. On appeal, the defendant argued the court erred by failing to sua sponte admonish the jury to disregard the remark or declare a mistrial. The appellate court concluded admonishment "would have had a more deleterious than beneficial effect by emphasizing the remark," and defense counsel's failure to request an instruction "was a wise tactical decision." (*Ibid*.) Then, the court explained that a mistrial "should not be declared where the court is satisfied no injustice has resulted or will result. [Citations.]" (*Ibid*.)

As can be seen in both *Vernon* and *Henderson* prospective jurors disclosed potentially prejudicial factual information about the defendant during voir dire. Both demonstrate a comment containing factual information about the defendant does not necessarily require the drastic remedy of discharging the jury panel.

Having examined the entirety of the jury selection proceedings, we conclude the trial court properly exercised its discretion when it refused to dismiss the entire jury panel given the equivocal nature of J.K's statement. J.K. did not say that appellant was one of his students. In fact, in front of the rest of the panel all J.K said was *if* it was the same person, appellant had been one of his students. J.K. did not clarify where he taught that student. J. K.'s statement was substantially less inflammatory than were the comments considered in *Henderson* and *Vernon*.

23

We cannot agree with appellant that J.K.'s statement would have informed the prospective jurors that he had a serious criminal past starting as a juvenile from which they would have concluded that he was a recidivist and had a propensity to commit serious crimes. We reject appellant's position for two reasons. First, for the prospective jurors to have reached the conclusion that J.K had taught appellant in juvenile hall and that appellant had committed serious crimes as a juvenile, the jurors would have had to have made that assumption unsupported by any facts. J.K. did not state directly that he taught appellant in juvenile hall and there was absolutely nothing said about appellant's juvenile criminal history. Second, appellant's position implies that the jury would have used this purported "evidence" against him. However, the sworn jurors were properly instructed that they were only to consider evidence that was presented in the courtroom and informed that evidence was the sworn testimony of witnesses. We must presume that the jury followed this instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 574.) Furthermore, the jurors were already aware that appellant had a criminal past; accordingly, we can find no prejudice to appellant. In sum, J.K.'s comment is too vague to be considered more prejudicial than the remarks in *Vernon* and *Henderson*.

Accordingly, we conclude that the trial court did not abuse its discretion in denying appellant's motion to dismiss the entire jury panel and this ruling did not infringe on appellant's right to a fair trial.

*Parole Revocation Fine*

As noted the court imposed but suspended a parole revocation fine in the amount of $220. Appellant contends and respondent concedes that we must strike this fine.

Section 1202.45 mandates imposing the fine on every sentence involving a period of parole. Since appellant's only sentence is life without the possibility of parole, the statute does not apply. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *People v. McWhorter* (2009) 47 Cal.4th 318, 380; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183-1186.) Accordingly, we strike the parole revocation fine.

*Disposition*

We strike the parole revocation fine in the amount of $220. As so modified, the judgment is affirmed. The clerk of the superior court is directed to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____
ELIA, J.

WE CONCUR:

_____
RUSHING, P. J.

_____
PREMO, J.

25