Filed 4/8/16  P. v. Yazzie CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067019 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD256675) |
| DERRICK HASTEEN YAZZIE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed as modified.

Marianne Harguindeguy, upon appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Daniel Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

At about four o'clock in the morning on a weekday, 58-year old Craig Bledsoe walked over to a neighbor's home to ask the occupants to turn down loud music.  Not

expecting a physical confrontation, Bledsoe was dressed in pajama bottoms, a shirt, and sandals. While Bledsoe was standing on the sidewalk, outside a fence in front of the house, sharp words were exchanged between Bledsoe and one of the occupants, Derrick Yazzie. When Bledsoe looked away for a moment, Yazzie reached over the fence and began punching him in the face. As Bledsoe retreated, Yazzie said, "If you call the police, I'll find you and beat your ass again."

A jury convicted Yazzie of assault by means likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4)) (count 1), battery with serious bodily injury (§ 243, subd. (d)) (count 2), and attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1)). The jury also found that in committing the assault, Yazzie personally inflicted great bodily injury upon the victim within the meaning of sections 12022.7, subdivision (a) and 1192.7, subdivision (c)(8). The jury similarly found that in committing the battery, Yazzie personally inflicted great bodily injury upon the victim within the meaning of section 1192.7, subdivision (c)(8).

The court sentenced Yazzie to three years in prison for the assault conviction, with the enhancement stayed. The court also sentenced Yazzie to a concurrent three-year prison term for the battery conviction and another three-year concurrent term for the conviction for attempting to dissuade a witness from reporting a crime—for a total prison term of three years. The court suspended execution of the sentence and placed Yazzie on

---

[1]     Unless otherwise stated, all statutory references are to the Penal Code.

formal probation for three years on conditions, including that Yazzie serve 365 days in county jail and pay $725 in restitution to the victim.

Yazzie's defense was one of mistaken identity. Yazzie asserted that Juan Villela, a friend who was also at the house that night, was the one who beat Bledsoe.

On appeal, Yazzie contends his convictions should be reversed for three principal reasons. First, he contends the court erroneously excluded hearsay testimony that Villela said, "I hit him." Yazzie argues that evidence was admissible under the spontaneous statement hearsay exception in Evidence Code section 1240 and that his attorney rendered ineffective assistance of counsel by not relying on that hearsay exception at trial. Second, citing *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*), Yazzie contends the exclusion of the hearsay evidence violated his due process right to a fair trial. Third, he contends there was insufficient evidence to support his convictions.

Last, Yazzie also contends, and the Attorney General agrees, that under section 654, the sentence imposed for battery should be stayed. We will modify the judgment to stay the sentence imposed for battery and, as so modified, affirm.

FACTUAL BACKGROUND

A. *The People's Case*

In May 2014 Bledsoe, who has insomnia, awakened at about 3:30 a.m. He heard loud music coming from a nearby house. After listening for 10 to 15 minutes, Bledsoe decided to ask the neighbors to turn down the volume.

Wearing his pajama bottoms, a shirt and sandals, and carrying his house keys in his hand, Bledsoe walked across the street and down five houses from his apartment, to a

3

single family residence where lights were on and the loud music and voices were coming from. In front of the house, parallel with the sidewalk, was a wood fence and gate. Bledsoe stood on the sidewalk, outside the fence and gate, and saw several people inside the house through the living room window, "hooting and hollering."

About three to five minutes later, Hannah Valenzuela exited the house and said to Bledsoe, "What," in a rude tone. Bledsoe replied, "Do you know what time it is? Do you have any respect for your neighbors?" Valenzuela said, "Are you asking me or telling me?" Bledsoe replied, "I'm asking you. Or are you too drunk to know the difference?" After stating, "You can't talk to me like that," Valenzuela went back inside.

Bledsoe stood there, thinking about whether to call police. A minute later, the front door opened. Valenzuela and three men exited the house and walked into the front yard.

Two of the men came up to the sidewalk, about 18 inches from Bledsoe, on the other side of the fence and short gate. Bledsoe got a "good look" at both men. One of them, Yazzie, was wearing wire-rimmed glasses, the other man did not wear glasses. Yazzie had long hair in a ponytail and a goatee. The other man had no ponytail. Yazzie was taller and heavier than the other man. At trial, Bledsoe identified Yazzie as the man who was across the fence, on Bledsoe's right side.

Bledsoe and Yazzie argued about the loud music. As the argument grew more heated, Bledsoe said he would call police if they could not resolve the situation among themselves. Bledsoe and Yazzie argued for about five minutes.

4

As Bledsoe turned to his left, Yazzie reached over the gate and punched Bledsoe in the side of the head. Yazzie opened the gate and rapidly punched Bledsoe 10 to 12 more times in the face and head. Bledsoe testified, "It was just crack, crack, crack, crack." Bledsoe had no chance to protect himself.

After punching him, Yazzie said, "Get the fuck out of here." Bledsoe retreated, walking across the street towards his apartment. Yazzie followed and threatened, "If you call the police, I'll find you and beat your ass again." Then, Bledsoe heard Valenzuela say, "No, Yazzie." Yazzie stopped and returned to his residence. Before this incident, Bledsoe had never met Yazzie and did not know his name. Bledsoe had moved into the neighborhood only three weeks before.

Bledsoe returned to his apartment, "bleeding all over the place," and called the police. Bledsoe sustained a laceration on his eyelid that required stitches, and a fractured eye socket that required surgery.[2]

Police arrived within about three minutes. Bledsoe described his assailant to police as a "dark skinned male with a long ponytail and goatee." Bledsoe accompanied police to the residence where he was attacked. While an officer made contact with the occupants at the front door, Bledsoe remained at the sidewalk, close to where he had been punched.

---

[2]     Yazzie's trial attorney essentially conceded Bledsoe sustained serious bodily injury, as she prefaced her first question on cross-examination by stating, "Mr. Bledsoe, I understand that you suffered a serious bodily injury when this occurred, so I'm not going to ask you any questions—any further questions about any of that. All I really wanted to talk to you about is the actual incident . . . ."

5

Yazzie came outside. Yazzie matched the description Bledsoe had given the officer: wire-rimmed glasses, long hair in a ponytail, and a goatee.

Bledsoe had not yet retrieved his glasses, and was having difficulty seeing. But once Yazzie started talking to the officer and Bledsoe heard his voice, Bledsoe said, "That's him. That's the guy." Bledsoe told police he was 100 percent sure of his identification. Even though it was dark and there were no street lights in the area, Bledsoe had no difficulty seeing Yazzie over the fence. He was looking at him most of the time. Bledsoe testified that the other man, standing to his left, could not have been the one who hit him "from where he was standing."

Bledsoe did not see the face of the person hitting him while he was being hit. At trial, Bledsoe explained why he was sure Yazzie was the person who punched him:

> "A: I was absolutely sure. [¶] I had waited because of my eyesight. [¶] I did not go there with the intent of just snatching up somebody for the sake of getting somebody to pay for what had been done to me. I wanted the person who had assailed me, and because I did not have my glasses on and I couldn't really see that far—I could have been able to see him clear enough up close to identify him. [¶] But I did not want to misidentify anyone, so I waited until I heard his voice when he spoke to the officer, and I knew at that point it was him. [¶] . . .
>
> "Q: As you sit here in court right now, are you 100 percent sure that it's the defendant that attacked you that day?
>
> "A: I'm 100 percent sure that it was the defendant here today that attacked me that morning. [¶] . . .
>
> "Q: Was the voice, the person who told you, 'No. Get the fuck out of here,' was that the same voice of the defendant who you had just been conversing with over the gate?
>
> "A: Yes.

6

"Q: And was that person in the same position as the person who had been punching you?

"A: Yes.

"Q: Was that voice, that person who said, 'Get the fuck out of here,' was that the same voice of the person who was following you and said: If you call the police, I'll beat your ass again?

"A: Yes."

Police arrested Yazzie, who had slightly swollen and pink knuckles on one hand. Yazzie told police that Bledsoe approached the house in an "aggressive" manner, and he (Yazzie) opened the gate to speak with him. Yazzie claimed Bledsoe was injured when he "fell."

B. *Defense Case*

Valenzuela gave two different stories, one at trial and a different story to police. At trial, Valenzuela testified that on the day of the incident, Yazzie, his brother, Edison, and their friend, Villela, were drinking and being loud. Valenzuela looked out the screen door, and saw Bledsoe outside the gate. According to Valenzuela, Yazzie was drunk, so she told Yazzie to stay inside while Villela and Edison went outside to deal with Bledsoe. A fight ensued. Valenzuela testified that immediately after the fight, Villela entered the house and said, "I hit him."[3] Yazzie was inside the house the whole time. Villela fled out the back door before police arrived.

---

[3]  This testimony was received in evidence without any objection or motion to strike.

7

To police, Valenzuela gave a much different account. At the time of Yazzie's arrest, she told police a homeless man was walking by and hit Bledsoe.

A week later, Valenzuela continued the story about the transient, telling a detective the assailant was a homeless man with tattoos on both arms and wearing a camouflage jacket. Even after the detective confronted Valenzuela with the glaring inconsistency in her story—how could Valenzuela know the homeless man had tattoos on both arms if he was wearing a camouflage jacket?—Valenzuela stuck to her story that a homeless man was the attacker.

At trial, Valenzuela admitted her story about the homeless man was a lie. She explained she was trying to cover up for Villela, who she feared would be deported if police learned he beat Bledsoe.

Yazzie also testified at trial, and his story also changed. At trial, Yazzie testified he remained inside the house during the entire incident because he "didn't want to jump into the mix." Yazzie testified that after the assault, he learned that Villela hit Bledsoe.

DISCUSSION

I. *ISSUES INVOLVING HEARSAY EVIDENCE*

A. *Factual Background*

The court sustained a hearsay objection when Valenzuela sought to testify that Villela told her he hit Bledsoe:

"Q: And then what happened?

"A: And then Juan ran inside the gate, and he said: I hit him.
[¶] And I said: Why did you hit him? [¶] And Juan said that: Well,

8

I kept asking him to leave, and he wouldn't leave, and he clenched
his fist together and put his chest up."

"[Prosecutor]: Objection: This is hearsay.

"The Court: Sustained."

The court also sustained a hearsay objection when Yazzie sought to testify that

Villela admitted hitting Bledsoe:

"[Yazzie]: And then as soon as we get into the house, like I heard
Juan like say that he—he did hit him. And I'm not sure how many
times.

"[Prosecutor]: I'm going to move to strike that as hearsay.

"The Court: Sustained. [¶] . . .

"Q: Did he rush to the bathroom to go wash his hands?

"A: I'm not sure. . . . [I]nitially when he came inside, like we did
turn off all the lights after that. Like—and then he just was like kind
of like: I hit the guy. [¶] Like kind of grabbed his stuff and he left.
[¶] I wasn't like 'Let me see your hands,' that kind of—

"[Prosecutor]: Motion to strike the statement: 'He said he hit the
guy.' That's hearsay.

"The Court: Sustained."

B. *Yazzie Has Forfeited Any Error in Excluding This Hearsay*

Under Evidence Code section 1240, statements made at or near the time of some

exciting event under the stress of excitement produced by the event and relating to the

event, are admissible as an exception to the hearsay rule. (1 Witkin, Cal. Evidence (5th

ed. 2012) Hearsay, § 174, pp. 1024-1025.) Yazzie contends the court abused its

discretion in sustaining these hearsay objections because Villela's statements—"I hit him"

9

and "I hit the guy"—made under stress and excitement immediately after beating

Bledsoe, were admissible under Evidence Code section 1240.

However, Yazzie forfeited this issue by not properly raising it at trial. The

proponent of hearsay testimony has the burden of alerting the court to the exception

relied upon, and of establishing the foundational requirements for admission of the

testimony under an exception to the hearsay rule. (*People v. Morrison* (2004) 34 Cal.4th

698, 724.) A party may not proffer grounds for admission of a statement on appeal if he

or she did not attempt to justify admission of the statement on such grounds at trial.

(*People v. Hines* (1997) 15 Cal.4th 997, 1034, fn. 4.)

Here, Yazzie's trial counsel made no attempt to alert the trial court to the legal

grounds upon Yazzie now seeks to justify admission of the proffered testimony, or to

establish the necessary foundation for the spontaneous statement hearsay exception.

Accordingly, the issue is forfeited. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1178.)

C. *Even if Yazzie Had Not Forfeited the Issue, Any Such Error Is Harmless*

In any event, even if the issue was not forfeited, and assuming for the sake of

argument that the court erred in sustaining these hearsay objections, any such error would

be harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which is the

"standard applicable to state law error in the admission of hearsay" evidence. (*People v.

Duarte* (2000) 24 Cal.4th 603, 619.)

Any error in this respect was harmless because Villela's hearsay statements came

into evidence at least five times, without objection or motion to strike. Valenzuela

testified that immediately after the fight, Villela entered the house and said, "I hit him."

10

The prosecutor did not object or move to strike this testimony. Moreover, Valenzuela repeated the same testimony—again without objection or motion to strike—two more times, as follows:

> "Q: What was the next thing that happened?
>
> "[Valenzuela]: I heard yelling, so I went outside, and I saw the stranger [Bledsoe] push Juan away from him. And the stranger was holding his head and he walked away down . . . the street.
>
> "Q: And then what happened?
>
> "A: And then Juan ran inside the gate, *and he said: I hit him.* [¶] And I said: Why did you hit him? [¶] . . .
>
> "Q: . . . [D]o you remember telling me [deputy district attorney] that *Juan hit the victim*?
>
> "[Valenzuela]: Yes. But I realized later I don't think I was being very clear, because *that's what Juan told me happened.* I did not actually see that." (Italics added.)

Similarly, without objection or motion to strike, Yazzie testified that Villela admitted hitting Bledsoe:

> "Q: How did you possibly think that telling officer Ryan, who's investigating the assault and battery of the victim—how did you think that telling him that you approached the victim and opened the gate and talked to him was going to help your situation?
>
> "[Yazzie]: Because I didn't really see the initial blows that he was— he received, so I didn't know if Juan pushed him or—*from—from what he said to me, he said he hit him.* At the same time, that's his word, and I don't know if he was able to—if he pushed him into something or if he tripped back or—from one push or some kind of physical altercation that happened. [¶] . . .
>
> "Q: . . . [W]hy is it that if you were innocent and you did nothing wrong and had nothing to hide, that you would allow [Valenzuela] to

11

just mislead this detective and create false evidence now so he's going to go out looking for a homeless guy who did it?

"A: I was still in the mind frame of—I was released from jail. And being in jail, I was thinking about the consequences of what's going to happen, and *my friend who assaulted—who I think did it—or said he did it*, I was worried about him at the time." (Italics added.)

Thus, the court's challenged hearsay rulings did not deprive Yazzie of his ability to present a defense that Villela admitted beating Bledsoe. The evidence excluded by the hearsay objections Yazzie challenges would have been merely cumulative to the same evidence, received without objection or motion to strike. Under these circumstances, it is not reasonably probable that overruling the hearsay objections would have resulted in a more favorable verdict. (*Watson, supra,* 46 Cal.2d at p. 836; see *People v. Helton* (1984) 162 Cal.App.3d 1141, 1146 [exclusion of hearsay evidence is harmless error when the excluded evidence was "merely cumulative of properly admitted evidence"].)

Additionally, the evidence against Yazzie was extremely strong. Valenzuela and Yazzie admitted lying to police about the incident. Moreover, Bledsoe identified his attacker with 100 percent certainty. The description Bledsoe gave police—a dark-skinned person with long black hair and goatee with wire rim glasses—matched Yazzie and did not match Villela, who was described as "light-skinned" with "plugs in his ears" and did not wear glasses. Even Valenzuela acknowledged that Villela would not easily be confused with Yazzie. At sentencing, the court told Yazzie, "I agree completely 100 percent with the jury's verdict. I'm 100 percent clear that you were the assaulter . . . ."

12

D. *Yazzie's Ineffective Assistance of Counsel Claim Is Unavailing*

Similarly, Yazzie's claim of ineffective assistance of counsel is also unavailing. In appropriate cases, we may dispose of ineffective assistance of counsel claims on the ground of lack of prejudice without determining whether counsel's performance was deficient. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) To establish ineffective assistance of counsel, Yazzie must show a reasonable probability exists that, but for counsel's alleged errors, the result would have been different. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*Id.* at p. 218.)

Any failure of Yazzie's trial attorney in not urging the court to overrule the hearsay objection under the spontaneous statement hearsay exception was harmless. As noted, the evidence Yazzie claims was critical to his defense—Villela's self-incriminating hearsay statements that "I hit him"—came into evidence five times without objection or motion to strike. Moreover, the evidence of Yazzie's guilt was overwhelming. The victim's testimony was detailed, compelling, and certain that Yazzie committed the attack. The physical evidence—Yazzie's swollen and discolored knuckles—was also consistent with Yazzie being the attacker. Valenzuela yelled, "No, Yazzie" (not, "No, Juan") in an attempt to stop Yazzie from pursuing Bledsoe after his attack.

E. *The Court's Exclusion of Villela's Hearsay Statements Does Not Implicate Yazzie's Due Process Rights*

Citing *Chambers, supra,* 410 U.S. 284, Yazzie contends the due process clause of the Fourteenth Amendment required Villela's hearsay self-incriminating statements to be

13

received in evidence. Yazzie asserts this error deprived him of fair trial and requires reversal.

We disagree because the exclusion of Villela's hearsay is not analogous to the issue addressed by the U.S. Supreme Court in *Chambers, supra,* 410 U.S. 284. *Chambers* involved the combined application of a state "voucher" rule that limited cross-examination to adverse witnesses and Mississippi's hearsay rules, which did not recognize a hearsay exception for statements against a declarant's penal interest. (*Chambers, supra,* 410 U.S. at pp. 294-296.) In *Chambers*, in which the defendant was charged with murder, the trial court applied these rules to preclude cross-examination of a witness, named McDonald, who had signed a sworn confession to the murder and made self-incriminating statements to others, but who at trial denied involvement in the homicide and repudiated his confession. (*Id.* at pp. 294-296.) Due to Mississippi's hearsay rule, the defendant was unable to present other witnesses who would have testified that McDonald had admitted to the murder. (*Id.* at pp. 289, 292.) The U.S. Supreme Court explained the evidence bore persuasive assurances of trustworthiness and was well within the basic rationale of the exception for declarations against interest, and was also critical to the defendant's theory of defense. (*Id.* at p. 302.) Thus, the court held "under the facts and circumstances of this case" the trial court's rulings deprived the defendant of a fair trial. (*Ibid.*)

The court in *Chambers* specifically limited its holding to the "facts and circumstances" presented in that case, and stressed that the ruling did not "signal any diminution in the respect traditionally accorded to the States in the establishment and

14

implementation of their own criminal trial rules and procedures." (*Chambers, supra,* 410 U.S. at pp. 302-303.) "*Chambers* therefore does not stand for the proposition that the accused is denied a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence." (*United States v. Scheffer* (1998) 523 U.S. 303, 316.) As a general matter, "the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834.)

The exclusion of Villela's hearsay statements in Yazzie's case is significantly different from what occurred in *Chambers*. The well-established hearsay rules applied by the court here are unlike the "voucher" rule, which *Chambers* noted "has been condemned as archaic, irrational, and potentially destructive of the truth-gathering process." (*Chambers, supra,* 410 U.S. at p. 296, fn. 8.) Moreover, here there was no refusal to allow the defendant to present a defense, but only a rejection of evidence that, as it turns out, is hearsay and cumulative to other evidence received. (See *People v. Espinoza* (1992) 3 Cal.4th 806, 818 [distinguishing *Chambers* from situations where a defendant was "not foreclosed from effectively challenging the prosecution's case or from presenting crucial exculpatory evidence"].)

## II. *SUBSTANTIAL EVIDENCE SUPPORTS THE CONVICTIONS*

Yazzie contends the evidence does not support his convictions because: (1) Bledsoe testified Yazzie appeared sober whereas the arresting officer stated Yazzie had been drinking; (2) the swelling and discoloration on Yazzie's hand was "relatively insignificant" given the extent of Bledsoe's injuries; (3) Valenzuela testified she yelled, "No. Yazzie" after the police arrived, whereas Bledsoe testified he heard Valenzuela yell

15

Yazzie's name before police arrived; (4) Bledsoe told the 911 dispatcher his assailant was Hispanic, whereas Yazzie is Native American; and (5) the person who beat Bledsoe said he was from a "third world" country.

We reject Yazzie's substantial evidence arguments. "'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.) The court will draw all reasonable inferences in support of the judgment and does not reweigh the evidence. (*People v. Vernon* (1979) 89 Cal.App.3d 853, 870.) It is the exclusive province of the jury to determine witness credibility. (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)

Here, the only contested issue was identity. Bledsoe identified Yazzie as his attacker with 100 percent certainty. Although Bledsoe did not see the face of the person hitting him while he was being hit, Bledsoe identified the voice of the person who said immediately after the beating, "Get the fuck out of here" and "if you call the police, I'll beat your ass again" as that of Yazzie, who he conversed with before the attack. The testimony of one witness—here, Bledsoe—may be substantial evidence to support a verdict. (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508.)

None of the points Yazzie raises undermine or diminish the substantial evidence supporting his convictions. It was the jury's role to assess their impact on witness credibility. "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury

16

to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585 (*Elliott*).)

Consequently, we will not reject Bledsoe's testimony found credible by the jury absent a showing that it was physically impossible for him to have identified Yazzie as his attacker, or that his testimony was blatantly false. (*Elliott, supra,* 53 Cal.4th at p. 585.) It was not physically impossible for Bledsoe to identify Yazzie, nor is there any evidence suggesting Bledsoe's identification was blatantly false. Bledsoe got a good, close look at Yazzie for five minutes before the attack and recognized his voice as the one who threatened him immediately afterwards. Bledsoe heard Valenzuela call out Yazzie's name, urging him to not pursue Bledsoe further. Yazzie and Valenzuela admitted they each lied to police, and each had a substantial interest in fabricating a story at trial. The jury was entitled to, and did, disbelieve their testimony in favor of Bledsoe's contrary testimony. "This court cannot reevaluate the credibility of the witnesses nor reweigh the evidence." (*People v. Baldwin* (1961) 191 Cal.App.2d 83, 86.) Substantial evidence supports Yazzie's convictions.

### III. *SENTENCING ERROR*

"Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) Yazzie contends, and the Attorney General agrees, that section 654 precludes sentencing Yazzie separately for assault and battery convictions based on the same incident, and therefore

17

the sentence imposed for count 2 (battery with serious bodily injury in violation of § 243, subd. (d)) should be stayed.

## DISPOSITION

The judgment is modified to stay imposition of sentence on count 2 pursuant to section 654. As so modified, the judgment is affirmed. The court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

IRION, J.

18